FILED
10/31/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2025 Session

## RUSSELL LEE MAZE and KAYE M. MAZE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
Nos. 99-B-1308; 2002-D-2361      Steve R. Dozier, Judge**

_____

### No. M2024-00666-CCA-R3-PC

_____

The Petitioners, Russell Lee Maze and Kaye M. Maze, seek post-conviction relief from their respective convictions related to their infant son's death in 2000 from abusive head trauma ("AHT"). The post-conviction court afforded the Petitioners an evidentiary hearing at which they presented purported "new scientific evidence" through various experts in an effort to establish their actual innocence. The State, through the Office of the District Attorney General for the Twentieth Judicial District ("District Attorney"), admitted the facts asserted by the Petitioners and agreed that the Petitioners were actually innocent of these offenses. Nonetheless, the post-conviction court determined that the Petitioners had failed to carry their burden of producing clear and convincing proof to establish their actual innocence, a determination which the Petitioners now challenge. On appeal, the State, through the Office of the Attorney General and Reporter ("Attorney General"), contends that the Petitioners failed to prove their actual innocence based on new scientific evidence, instead proffering only new opinions on previously presented evidence, which supports the post-conviction court's denial of relief. In addition to the underlying substantive merits of their actual innocence claims, the Petitioners also raise certain procedural issues: (1) whether review of Mr. Maze's appeal, which began as a motion to reopen his prior post-conviction petition, is permissive or an appeal as of right; (2) whether Mrs. Maze's petition for post-conviction relief, her first, is time-barred; (3) whether the State improperly changed its position on appeal in violation of due process, judicial estoppel, and waiver; (4) whether the post-conviction court's ruling infringed upon prosecutorial discretion and violated the party-presentation principle; (5) whether the post-conviction court erred by denying Mrs. Maze relief without independent review of her actual innocence claim; and (6) whether this case should be remanded to the post-conviction court for consideration of the original medical examiner's recent recantation of his trial testimony, which has occurred during the pendency of this appeal. After review, we determine that a remand is unnecessary and affirm the judgments of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which J. ROSS DYER, J., joined. TOM GREENHOLTZ, J., filed a separate opinion, concurring in part and dissenting in part.

Jason Gichner, Connor A. Webber (on appeal and upon motion to reopen), Madison Lowery (on appeal), Katie Hagan (upon motion to reopen), The Tennessee Innocence Project; and Charles E. Elder (on appeal and upon motion to reopen), Claire Fox Hodge, and Casey Miller (upon motion to reopen), Nashville, Tennessee, for the appellant, Russell Lee Maze.

Melissa K. Dix, Daniel A. Horwitz (on appeal and upon motion to reopen), Sarah L. Martin (on appeal), and Lindsay Smith (upon motion to reopen), for the appellant, Kaye M. Maze.

Jonathan Skrmetti, Attorney General and Reporter; Nicholas S. Bolduc, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Anna B. Hamilton and Sunny M. Eaton, Assistant District Attorneys General, for the appellee, State of Tennessee.

Timothy Carter, Nashville, Tennessee; and James C. Dugan, Ferdinand G. Suba, Jr., Jung Hyun Lee, and Autumn Adams-Jack, New York, New York, for the Amicus Curiae, Legal Scholars.

Brian K. Holmgren, Franklin, Tennessee, and Katrin Novak Miller, Thompson Station, Tennessee, for the Amicus Curiae, Trial Prosecutors.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY[1]

On the afternoon of May 3, 1999, Mrs. Maze left the couple's home to run an errand, leaving Mr. Maze alone with their five-week-old son ("the victim"). *State v. Maze*, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *1 (Tenn. Crim. App. Apr. 28, 2006), *perm. app. denied* (Tenn. Aug. 28, 2006). While Mrs. Maze was away, something happened to the victim that caused him to stop breathing, which prompted Mr. Maze to call 911. *Id.* When the paramedics arrived, they performed CPR as they carried the victim to the ambulance. *Id.* The victim's heart started beating spontaneously once they were inside the ambulance, and the victim was intubated to induce breathing. *Id.* at *2. According to

---

[1] Much of this summary comes from the various courts that have issued opinions on this case over the years. However, where citations are absent, we have supplemented these facts with our own review of those records. *See* Tenn. R. App. P. 13(c); *Harris v. State*, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (noting that an appellate court may take judicial notice of its own records). Many of said records are also attached as exhibits to these proceedings.

- 2 -

one paramedic, the victim's pupils were fixed and dilated, indicating to him that the victim had been oxygen deprived for some time. *Id.*

The victim was taken to Vanderbilt Children's Hospital ("Vanderbilt") where he was examined by medical professionals and received treatment. *Id.* That examination revealed that the victim had suffered head and abdominal bruising, subconjunctival and retinal hemorrhaging in both eyes, and a fractured clavicle, as well as severe, irreparable brain damage. *Id.* at *2-6. Following extensive treatment, the victim was ultimately discharged from the hospital on May 29, 1999, and placed in foster care. *Id.* at *6. Thereafter, the victim required constant care; his respiration had to be closely monitored; and he could not swallow unassisted. *Id.* "[A]s a result of the May 3 injuries, the [victim] had severe cerebral palsy and recurrent seizures that became worse over time." *Id.* Eighteen months later, on October 19, 2000, the victim was readmitted to Vanderbilt, where he died on October 25. *Id.*

A. Initial Charges and Early Proceedings

Based upon a theory of AHT as the cause of the victim's May 3 injuries, a Davidson County grand jury indicted the Petitioners as codefendants on June 4, 1999. In the indictment, Mr. Maze was charged with one count of Class A felony aggravated child abuse (count 1). *See* Tenn. Code Ann. § 39-15-402. Mrs. Maze was charged with one count of Class C felony aggravated assault due to her failure to protect the victim (count 2). *See id.* § -102.

On May 25, 2000, Mrs. Maze entered a best-interest, or *Alford*,[2] plea to reckless aggravated assault, a Class D felony, in exchange for a two-year sentence, suspended to three years' probation. At the guilty plea hearing, the prosecutor provided a factual recitation of the offense, alleging that Mrs. Maze began observing bruises on the victim "following a doctor's visit" and that she questioned Mr. Maze about the cause of the bruising, but he was unable to provide an explanation. During the following week, Mrs. Maze "observed additional bruising" about the victim's head and abdomen. Nonetheless, on three separate occasions, she "continued to leave" the victim in Mr. Maze's care, which resulted in the victim's being "violently shaken and assaulted, producing significant injuries[.]" After the conclusion of Mrs. Maze's probation, several years later, the trial court denied her request to expunge all public records related to her case.

---

[2] This type of plea is named after *North Carolina v. Alford*, 400 U.S. 25 (1970), in which the United States Supreme Court discussed the right of an accused to plead guilty in his or her best interest while still professing his or her actual innocence.

Mr. Maze proceeded to his first trial by jury in January 2000 and was found guilty as charged of aggravated child abuse. *State v. Maze*, No. M2000-02249-CCA-R3-CD, 2002 WL 1885118, at *1 (Tenn. Crim. App. Aug. 16, 2002), *no perm. app. filed*. However, on direct appeal, this court reversed his conviction and remanded the case for a new trial due to the trial court's failure to properly instruct the jury on lesser included offenses. *Id.* After the case was remanded to the trial court, the State sought and obtained a superseding indictment charging Mr. Maze with first degree felony murder of the victim, now deceased, in addition to aggravated child abuse. *Maze*, 2006 WL 1132083, at *1. Mr. Maze was retried in April 2004.

### B.      Evidence Presented at Mr. Maze's Second Trial

#### 1.      State's Proof

The April 2004 trial centered on the medical evidence regarding the victim's suffering AHT. *See generally Maze*, 2006 WL 1132083, at *1-14. Mr. Maze "fiercely contested the charges . . . , and both he and the [S]tate introduced prodigious expert medical evidence to support their respective positions." *Id.* at *1.

The victim's regular pediatrician, Dr. Lesa Sutton-Davis, testified that she first saw the victim in her office on April 9, 1999, shortly after his birth. *Id.* at *7. According to Dr. Sutton-Davis, the victim was "a healthy newborn," weighing four pounds, nine ounces and measuring eighteen and one-half inches long. *Id.* Likewise, his "neurological and developmental assessments . . . were normal." *Id.* When Dr. Sutton-Davis saw the victim again on April 26, "she saw no injuries or bruising about the [victim's] head or abdomen, and she saw nothing suggesting any neurological abnormality." *Id.* When the State asked her "about medical records purporting to document that the [victim's] head circumference had increased three centimeters within several days[,]" Dr. Sutton-Davis "speculated that the measurements may have been taken by different nurses who were not using the same location on the [victim's] head for measurement." *Id.*

Following the victim's injuries on May 3, 1999, he "was admitted to the intensive care unit [at Vanderbilt] where he received emergency treatment and underwent diagnostic testing." *Id.* at *2. A Vanderbilt emergency room physician, Dr. Ian Jones, testified that the victim presented with "very significant neurological insult," there was bruising about the victim's head and chest, and the victim was not breathing on his own or moving spontaneously, effectively in a coma. *Id.* "His findings were that the [victim] had a 'subarachnoid bleed' in the layers of the brain, a brain contusion, and a subdural hemorrhage." *Id.* at *3. Dr. Jones "was suspicious of traumatic injury," so Dr. Suzanne Starling, an expert in the fields of pediatric medicine and child abuse, including head

- 4 -

trauma, was asked to consult and assist in evaluating the victim's condition. *Id.* at *2-3. Similarly, Dr. Starling described the victim's "injuries as 'fairly obvious,' and they included bruising along the eye area, subconjunctival and retinal hemorrhaging in both eyes, and abdominal bruising." *Id.* at *3. Dr. Starling described the victim's abdominal bruising: "He had a large, purplish bruise on his abdomen, all the way from his ribs to his groin and from his belly button around his side, a very large bruise on his belly." Dr. Starling "also identified x-rays[, taken two days apart,] showing the [victim's] fractured clavicle bone, and she estimated that the fracture was recent because the x-rays did not detect any callus development[,]" which would have been indicative of healing. *See id.* at *4.

Dr. Starling spoke with the Petitioners to obtain a medical history and find out what had happened to the victim. *Id.* at *3-4. Both Petitioners described the victim to Dr. Starling as an affable child until the day before, when he cried constantly and was unusually "fussy." *Id.* Mrs. Maze indicated that when she returned home late that evening from work, she fed the victim four ounces of liquid that he promptly vomited. *Id.* at *4. The victim remained "fussy" throughout the evening and did not sleep that night. *Id.* at *3-4. Mrs. Maze said that the victim tolerated his feeding at 5 a.m., but he again vomited when she fed him at 8:30 a.m. *Id.* at *4. According to Mrs. Maze, around noon that day, the victim "had a slight temperature, was 'whimpering,' and dozed with his eyes half open," so she gave him "a dropper of Tylenol" before leaving to go to the store. *Id.* Mr. Maze told Dr. Starling that, as he was about "to shave and shower[,]" he noticed that the victim was no longer "fussing," so he went to check on him. *Id.* at *3. At that time, the victim "was pale and gasping," and his eyes were only partially open. *Id.* Mr. Maze indicated that he "picked up the limp infant, . . . 'patted' him on the face to revive him," and then checked his heart with a stethoscope. *Id.* Because the victim stopped breathing, Mr. Maze called 911 and initiated CPR. *Id.*

However, Mr. Maze could not explain the bruising on the victim's face, and Mrs. Maze, although she had noticed the bruising three to four days earlier, could also not account for the cause. *Id.* at *3-4. Regarding the abdominal bruising, which was more recent, Mr. Maze said that it might have been caused by massaging the victim's stomach to soothe stomach pains. *Id.* at *3. But Mrs. Maze did not believe that this level of massaging could have caused the victim's abdominal bruising. *Id.* at *4. Dr. Starling testified that Mr. Maze's "explanation for the [victim's] injuries did not coincide with her observations and findings." *Id.* at *3.

Dr. Starling ultimately "diagnosed the [victim] as having 'a constellation of things wrong with him,' including the brain injury, massive internal bleeding throughout the brain area, and a fractured [clavicle]." *Id.* at *4. She also stated that there was "clearly" some

impact to the victim's head. In Dr. Starling's opinion, when the victim's injuries were viewed in combination, "the only way . . . [to] get that significant an injury in all those places is to be a battered child." *Id.* Dr. Starling indicated that the victim's clavicle could have been injured either by squeezing on the clavicle itself or squeezing on the chest causing the clavicle to "pop out" and snap. Dr. Starling concluded that, to a reasonable degree of medical certainty, the victim suffered from "'[AHT]' or 'inflicted cerebral trauma,' more commonly known as 'battered child syndrome' or 'shaken-baby syndrome'" ("SBS"). *Id.* According to Dr. Starling,

> [t]he major diagnostic features of the syndrome/trauma include: (1) the child's medical history does not account for the injuries; (2) the primary care givers provide different or conflicting accounts of the injuries; (3) the [caregivers'] versions of events will change over time; and (4) the child exhibits swelling inside the brain, bleeding inside and around the brain, and retinal hemorrhages.

*Id.* In terms of brain swelling, Dr. Starling "explained that it presses upon brain areas that regulate breathing and heart circulation and 'forces the body to shut down.'" *Id.*

As for other possible ailments, Dr. Jones testified that the victim had no signs of infection, a spinal tap proved negative for meningitis, and a Computerized Axial Tomography ("CAT" or "CT") scan revealed no injuries to the victim's internal organs, such as the liver, kidneys, and spleen. *Id.* at \*2. Dr. Jones explained "that trauma can have curious indicators and that he had seen individuals with significant abdominal bruising but no internal-organ injury and vice versa." *Id.* at \*3. Dr. Starling confirmed this information from Dr. Jones, and she added that the victim's blood "clot[ted] normally" and that he tested negative for bleeding disorders. *See id.* Dr. Starling also confirmed that the victim's liver function tests were normal and that he "did not have Alagille Syndrome, an inherited liver disorder that can cause clotting dysfunctions." *Id.* at \*5. She affirmed that "tests were conducted[] to eliminate other medical causes for [the victim's] particular condition" and that "everything else" was excluded.

Dr. Starling "could name no other equivalent trauma that would cause similar patterns of injuries" besides AHT, specifically excluding premature birth, neonatal jaundice, or complications during pregnancy such as the mother suffering from hypertension and gestational diabetes. *Id.* at \*4-5. She confirmed that "a great many children" are born with "very minor, little, tiny hemorrhages in the backs of their eyes, that resolve within several days[,]" but explained that the victim was several weeks old by May 3 and that his retinal hemorrhages were much more severe than those that might have been caused at birth. Dr. Starling also stated her awareness that the victim "suffered from

- 6 -

tachycardia" and "hyperbilirubinemia," but she said that these conditions were common in infants and typically resolved quickly. Also, according to Dr. Starling, the victim had stopped taking medication for his fast heartbeat a few weeks prior to his May 3 injuries.

Dr. Sutton-Davis and Dr. Starling both testified regarding the administration of the Hepatitis B vaccine to the victim and about the possibility of adverse side effects from the vaccine. *Id.* at *5, *8. Dr. Starling agreed with Dr. Sutton-Davis that the "U.S. Public Health Service and the American Academy of Pediatrics [had] called for the elimination of mercury content in childhood vaccines, including Hepatitis B, and recommended a roll back on vaccinating all newborn infants with the Hepatitis B vaccine." *Id.* at *5, *8. While Dr. Starling "recognized that ingesting 'massive amounts of mercury' can cause brain damage[,]" she, like Dr. Sutton-Davis, was not aware of any "credible scientific evidence showing any 'neurologic devastation' associated with Hepatitis B vaccines." *Id.* at *5, *8. While "there were reports claiming that the vaccine 'might be' associated with [Guillain-Barré] Syndrome or with worsening of multiple sclerosis[,]" Dr. Sutton-Davis emphasized that "these illnesses . . . do not exhibit the same symptoms seen in" SBS cases. *Id.* at *8. Finally, Dr. Starling "flatly disagreed that the Hepatitis B vaccine [could] lead to retinal hemorrhaging." *Id.* at *5.

Dr. Starling was also questioned regarding the continuing evolution of the medical community's understanding of SBS and her knowledge of the modern-day medical science surrounding the diagnosis. She indicated her understanding that other medical conditions could cause the triad of symptoms—retinal hemorrhaging, subdural hematoma, and encephalopathy—that were present in the victim on May 3. As for the disagreement amongst medical professionals regarding the diagnosis, she verified that "[t]here is a . . . longstanding conversation among physicians of whether or not just shaking cause[s] the injury received or if there's some sort of impact." She agreed that "[t]here's a lotta scientific research going on, there are groups of people who disagree with each other, as in every other field of medicine, on any given day." She further noted that CAT scans were relatively new around the time of the victim's injuries, but she confirmed that she reviewed the reports and findings associated with the victim's scans. When asked about the lack of evidence of any neck injury in the victim, she responded that "neck trauma" was "not part of the definition" of SBS. She explained that some children have neck trauma, while others do not, and that only some children "who are shaken have bleeding along the muscles in their neck or bleeding around the spine of the neck[.]"

Dr. Mark Jennings, an expert in the field of pediatrics and neurology, first saw the victim on the evening of May 3 at approximately 11:40 p.m. *Id.* at *6. Dr. Jennings

testified in detail about the findings from the [victim's magnetic resonance imaging ("MRI")] scans performed on May 12. He pointed out a large collection of blood mainly on the left side of the upper part of the brain indicating a "severe acceleration-deceleration injury." He reconstructed the injury as resulting from a blow applied to the left forehead; "the [victim's] head was then struck against an object hitting primarily the right parietal occipital area and posterial portion of the skull" which threw the [victim's] head "back and then may've rebounded forward again in order to produce [the] acceleration/deceleration injury." Doctor Jennings also observed that pressure within the brain increased to the point of causing a "herniation syndrome," meaning that the pressure forced the brain "down through the boney opening at the base of the skull." The head trauma was non-accidental in his opinion.

*Id.* Ultimately, Doctor Jennings concluded "that the [victim's] injuries could not have occurred days—or even hours—before [Mr. Maze] summoned emergency services." *Id.*

While the victim was hospitalized, Investigator Lee Allen with the Department of Children's Services in Davidson County also spoke with Mr. Maze. *Id.* at \*8. According to Investigator Allen, Mr. Maze "attributed the bruising on the [victim's] head to an earlier injury caused by the aspirator and the stomach bruising to stomach cramps." *Id.* Mr. Maze informed Investigator Allen that, "as he was getting into the shower, he noticed that the [victim] had stopped crying and was pale." *Id.* When Mr. Maze picked up the victim, the victim "was limp and gasping for air," and his "eyes were half open and dilated." *Id.* Mr. Maze "said that he 'tapped [the victim] on the cheek,' checked the heart rate with a stethoscope, began CPR, and called E 911." *Id.*

Detective Ron Carter, who was assigned to the Youth Services division of the Metropolitan Nashville Police Department, spoke with both Petitioners at the hospital. *Id.* at \*9. Det. Carter's recorded interview with Mr. Maze was played for the jury. *Id.* In the recording, Mr. Maze "gave inconsistent statements regarding whether the shower water was running as he listened for the [victim]." *Id.* He also "repeatedly denied shaking the [victim], but he eventually conceded first that he 'might' have shaken the [victim] and second that he shook the [victim] because he 'freaked out.'" *Id.*

When the victim was released from the hospital on May 29, 1999, he was placed in the care of Sandra Roberts, a social worker with the Center for Family Development in Bedford County, and her husband. *Id.* The couple "had received foster-care training involving children with special needs." *Id.* Ms. Roberts testified that the victim "could not feed himself or swallow and could not sit up or crawl" and that he "had seizures on a

daily basis and was frequently congested." *Id.* According to Ms. Roberts, the victim's blood was tested frequently "[b]ecause of the possible side effects from the seizure medicines . . . . Ms. Roberts noticed no negative reactions to any vaccines that the [victim] received." *Id.*

Dr. Jennings remained the attending neurologist following the victim's May 29, 1999 discharge from the hospital until the victim's subsequent death on October 25, 2000. *Id.* at *6. During that time, he saw the victim on an outpatient basis on six different occasions. *Id.* According to Dr. Jennings, the victim's "medical problems were the direct result of the May 3 head trauma, and he described the problems as 'progressive, predictable, perhaps, almost inevitable.'" *Id.* Dr. Jennings said that, when the victim was brought to the hospital on October 19, 2000, he "was profoundly comatose with signs of multi-organ failure." *Id.* at *7. This included "elevated liver functions," meaning that "the liver was not making the necessary enzymes to clot blood." *Id.*

Dr. Mary Baraza Taylor, a pediatric critical-care physician at Vanderbilt, attended the victim upon his second hospitalization in October 2000. *Id.* at *8. After the victim was found in an unresponsive condition, he regained his pulse, but Dr. Taylor "estimated a lapse of approximately [twenty] minutes" had occurred by that time. *Id.* Dr. Taylor indicated that the victim "had no meaningful response and no spontaneous movements and showed symptoms of 'anoxic brain injury' from lack of oxygen to the brain and other organs, including the liver. Even so, when the [victim] was admitted, his white blood cell count was normal, and no infection was detected." *Id.* Dr. Taylor opined that it was unlikely the victim was suffering from severe liver hepatitis on October 19 because the victim's liver enzymes were normal at that time. *Id.* However, according to Dr. Taylor, the victim's liver enzymes showed a "dramatic change" following his admission, and "an individual with fatal liver disease would gradually go into a coma and die after a period of days." *Id.*

Finally, Dr. Bruce Levy, the Chief Medical Examiner for Tennessee and the county medical examiner for Davidson County, testified that he performed the victim's autopsy on October 26, 2000. *Id.* at *9. Dr. Levy had "obtained the medical records of the injury that [the victim] sustained at five weeks of age, as well as subsequent follow-up examinations of [the victim], up to and through the final admission that resulted in his death in October of [2000]." Dr. Levy testified that the manner of death was homicide, explaining as follows: "I determined the cause of death as anoxic encephalopathy due to a seizure disorder due to shaken-baby syndrome. The anoxic encephalopathy is a condition when the brain is deprived of oxygen for a long period of time." *Id.*

According to Dr. Levy, a seizure "most likely" caused the victim to stop breathing. *See id.* He also noted that the victim "had documented periods of apnea[,]" a condition

that caused him to stop breathing for short periods, which might have "very well contributed to that terminal event." Dr. Levy said that the underlying cause for the victim's seizure disorder and apnea condition was the traumatic brain injury that occurred in May 1999. *See id.* He testified that he did not simply review the victim's medical records and rush to judgment, but rather he examined the body, and based upon "the pattern of those injuries" he observed, determined that it was consistent with SBS.

Moreover, Dr. Levy testified that, "on x-ray and visually during the autopsy[, he observed] a deformity of the left clavicle,[3] which was consistent with the fracture that had been described in May of [1999]." He also said that he "found the deposition of iron in the back of the [victim's] eyes" upon review of the autopsy slides, indicating prior retinal hemorrhaging. Dr. Levy related that roughly one-third of infants are born with retinal hemorrhages, that it was possible the victim's prior retinal hemorrhaging occurred at birth, and that the victim's prematurity increased the risk of brain hemorrhaging.

Dr. Levy testified that he found no signs of infection or "other medical conditions or medical disorders" in the victim's body upon autopsy. He further opined that nothing unrelated to the original brain injury of May 3, 1999, including hepatitis, caused or contributed to the victim's death. *Id.*

He explained that the cause of damage to the victim's liver came from the deprivation of oxygen on October 19, 2000, and he found similar evidence of damage in the victim's "intestines" and the "musculature throughout his body[,]" including the victim's diaphragm. He noted that he had reviewed the reports from the defense experts suggesting that the victim "had a liver disorder or a liver disease," but this did not change his opinion as to cause and manner of death because there "was no sign of liver failure on [the victim], at the time of his death." He clarified that he had observed the victim's liver "with the naked eye as well as under the microscope"; that there was no evidence of any liver injury in the victim's medical records prior to his admission on October 19, 2000; and that the victim had been vaccinated against Hepatitis B. "As corroboration, Dr. Levy noted that from May 1999 through October 10, 2000, the [victim's] liver enzymes were normal, but they became markedly elevated as of October 19, 2000, and continued to elevate. Those test results were consistent with an acute hepatic injury rather than a chronic hepatitis infection." *Id.* He also said that hepatitis would cause damage "throughout the entire liver[,]" which was not what he observed during the autopsy examination, and that hepatitis would be a much longer disease process. *Id.* Dr. Levy explained that liver injury was a possible side effect of the anticonvulsants being given to the victim to control his seizures. *Id.*

---

[3] He later confirmed that his autopsy report noted a deformity to the right clavicle, rather than the left, which was incorrect.

Following the conclusion of Dr. Levy's autopsy of the victim, Dr. Jennings reviewed the autopsy slides and learned that, upon the victim's death, his liver showed signs of "'hepatic necrosis,' or, in other words, dead liver tissue." *Id.* at *7. According to Dr. Jennings, the victim "never displayed liver disease prior to the October 19 hospitalization[.]" *Id.* Dr. Jennings confirmed that the victim's "liver injury [was] a possible side effect of the anticonvulsants being given to control seizures." *Id.* Dr. Jennings did not believe that the victim had "a pre-existing liver disease that caused cardiac arrest or interruption of breathing on October 19[,]" but rather, "[h]e believed that the liver abnormalities 'were secondary to the respiratory arrest' of October 19." *Id.*

## 2. Defense's Proof

Mr. Maze testified in his own defense. *Maze*, 2006 WL 1132083, at *10-12. Regarding any discoloration or bruising seen on the victim prior to his May 3, 1999 hospitalization, Mr. Maze

> said that he and his wife had noticed some skin discoloration, including a "blotchy mark" when the infant left the hospital, a bruise on the left side of the [victim's] head, a more recent bruise on the right side of the [victim's] forehead, which he attributed to [Mrs. Maze's] wristwatch or the [victim's] aspirator, and a light bruise on the [victim's] stomach.

*Id.* at *10. Mr. Maze relayed that he decided to take a shower on the morning of May 3, but "after he disrobed and reached to turn on the water, he noticed that the [victim] was making no noises." *Id.* at *11. When he went to check on the victim, the victim "was pale white," limp, and lifeless. *Id.* So, he picked up the victim, "called out [the victim's] name," and rubbed the victim's head and "little cheeks." *Id.* Mr. Maze said that he called emergency services and began CPR after he checked the victim's heart rate. *Id.*

When Mr. Maze was asked whether he shook the baby at all, he responded, "[N]ot that I recall . . . I may have." *Id.* at *11. He denied intentionally lying to the officers and physicians when he failed to mention shaking the victim, explaining that he was very emotional and distraught. *Id.* He then claimed "that his memory of the events was unclear" and said that "what [he] considered shaking was not [to] the point that was described on May 3rd." *Id.* According to Mr. Maze, "the purpose of the shaking was to revive or awaken" the victim, and he "described what he did as 'jostling' rather than shaking." *Id.* Mr. Maze "insisted that he did not shake the [victim] 'to the violent extent' to which the doctors referred." *Id.* When, however, Mr. Maze made his admission to Det. Carter after being asked repeatedly about the shaking, he "prefaced it by saying that he would only talk

outside [Mrs. Maze's] presence because he did not want [her] to know what happened." *Id.* Regarding the fractured clavicle, Mr. Maze "acknowledged the possibility that he could have caused the injury[,]" explaining, "I think, when I picked him up outta the crib and jostled him to revive him or to see if he was responsive, I possibly could have done that then." *Id.* at *12.

Mr. Maze also presented testimony from Mrs. Maze. *See id.* at *12-13. Mrs. Maze related her pregnancy complications, which included cramps, bleeding, gestational diabetes, hypertension, and low amniotic fluid. *Id.* at *12. According to Mrs. Maze, "[s]even days after receiving the second Hepatitis B vaccine, the [victim] collapsed, and during that seven-day period, . . . the [victim] developed a slight discoloration on his temple and seemed to get 'fussier and fussier.'" *Id.* Mrs. Maze admitted that there was a "possibility" that she told Dr. Starling the victim was "normal until brought to the hospital and that she told Detective Carter that [the victim] did not become fussy until she began her part-time job" and left him in Mr. Maze's care. *Id.* at *13. Indeed, she told Det. Carter that "the bruises first appeared the weekend that she began her part-time employment." *Id.* Mrs. Maze acknowledged that Mr. Maze admitted to her that "it was possible that he 'might' have shaken the [victim] and that in picking up the [victim], it was possible that he could have fractured the clavicle." *Id.*

The three remaining defense witnesses were physicians. *Id.* at *13-14. Dr. Nicole Schlechter, Mrs. Maze's attending obstetrics and gynecology physician, testified about Mrs. Maze's "high-risk" pregnancy, which included "chronic hypertension, gestational diabetes, inter-uterine growth restriction, and low amniotic fluid level[.]" *Id.* at *13. Despite the high-risk nature of the pregnancy, Dr. Schlechter "did not use forceps to deliver the baby; she considered the baby to be healthy, despite being small for his gestational age, and detected no adverse effects from [Mrs. Maze's] pregnancy complications." *Id.*

Dr. Edward Willey, an expert in pathology, reviewed Dr. Levy's autopsy report and the autopsy slides, and he agreed with many of Dr. Levy's findings, "but not all of them." *See id.* In Dr. Willey's opinion, "liver disease" caused by "aggressive hepatitis" was a "reasonable explanation for [the victim's] death." *Id.* Also, Dr. Willey noted that the victim had "an abnormal diaphragm," resultant from "a typical hereditary-type myopathy," that would make it difficult for him to breathe. *See id.* Dr. Willey "did not believe it [was] medically reasonable to attribute the death of the [victim] in October 2000 to a trauma that occurred on May 3, 1999." *Id.* Regardless, Dr. Willey "did not dispute that the [victim] had definite and severe brain injuries." *Id.* On cross-examination, the State challenged Dr. Willey's hepatitis diagnosis, but he refused to agree that oxygen deprivation for fifteen to twenty minutes "would cause the degree of liver damage shown on the slides, although he did acknowledge that oxygen deprivation would elevate the liver enzymes." *Id.* Moreover,

Dr. Willey maintained that, whatever the cause of the victim's cessation in breathing, "the myopathy of the [victim's] diaphragm aggravated the situation." *Id.*

Finally, Dr. Mary Kay Washington, a professor of pathology at Vanderbilt University and board certified in anatomical and clinical pathology, with expertise in liver and gastrointestinal pathology, criticized Dr. Levy's autopsy findings concerning the victim's liver and his failure to note a myopathy or "inflammation in the diaphragm." *See id.* at *14. Dr. Washington said that, unlike Dr. Levy, she observed "significant abnormalities" in the victim's liver. *Id.* When asked to identify the type of hepatitis seen in the victim, she indicated that it could have been viral or caused by medication. According to Dr. Washington, the "abnormalities and inflammation indicated a pattern of injury attributable to hepatitis," the degree of which "certainly could've been a significant contribution to death." *Id.* However, Dr. Washington conceded "that the [victim's] brain injury was the overriding cause of death" and that a liver disorder did not cause the victim to stop breathing on October 19, 2000. *Id.*

Following the conclusion of the proof, the jury convicted Mr. Maze as charged of first degree felony murder and aggravated child abuse. *Id.* at *1. He received concurrent sentence terms of life imprisonment and twenty-five years, respectively. *Id.*

### 3.  Direct Appeal

Mr. Maze appealed his convictions to this court. On appeal, he challenged (1) the sufficiency of the evidence; (2) the trial court's preclusion of defense expert witness testimony from pediatrician Dr. Edward Yazbak that there are "many known and reported cases" of adverse effects from Hepatitis B vaccinations, including retinal hemorrhaging and subdural hemorrhaging; and (3) the jury's alleged exposure to prejudicial extraneous influences from third parties. *Maze*, 2006 WL 1132083, at *1, 19.

As for his sufficiency of the evidence claim, Mr. Maze advanced several medically based arguments. Specifically, he argued as follows:

> (1) that the evidence supported the defense theory that the [victim] had some pre-existing intercranial pressure, probably from a subdural hemorrhage, which was the result of a spontaneous re-bleeding of an older hemorrhage; (2) that the evidence showed that the [victim] had significant and fatal liver disease such that it was not medically reasonable to attribute death to the incident that occurred in May 1999; (3) that from examining the brain at the autopsy, it was not possible to determine what caused the injury and that no degree of medical certainty directly tied the cause of death to the May 3, 1999

- 13 -

incident; (4) that the myopathy or deterioration in the [victim's] diaphragm could not be excluded as contributing to the breathing cessation on October 19, 2000; (5) that the Hepatitis B vaccine administered to the [victim] contained thimerosal, a preservative containing mercury which can cause brain damage, and that adverse reactions to the Hepatitis B vaccine had been reported; and (6) that the [victim] was not healthy from birth as a result of pregnancy complications of [Mrs. Maze].

*Id.* at *15. This court concluded that (1) a rational jury "could conclude from the medical evidence and testimony that the [victim's] 'neurologic devastation,' per Dr. Starling's description, was not caused by premature birth, jaundice, liver disorder, or Hepatitis B vaccines"; and (2) "the jury was entitled to credit the [S]tate's medical evidence that no intervening causes unrelated to the original brain injury on May 3, 1999, were responsible for the [victim's] death." *Id.* at *16-17. Moreover, this court mentioned the non-medical evidence that supported a guilty verdict, noting that Mr. Maze had "admitted at trial that he had shaken [the victim], although he insisted that the shaking was not violent, and he conceded that he could have fractured the [victim's] clavicle." *Id.* at *16.

Relative to the presentation of Dr. Yazbak's testimony, this court held that the trial court abused its discretion by excluding the testimony "without exploring other possibilities." *Id.* at *19. Nonetheless, "the exclusion of the expert testimony did not affect the result of the trial" because the defense was able to "explore[] medical issues favorable to its position[,]" and "Dr. Yazbak's testimony would not have explained the [victim's] neurologic devastation and severe brain trauma." *Id.* Ultimately, this court affirmed Mr. Maze's convictions. *Id.* at *1.

### C.     Mr. Maze's Subsequent Litigation

#### 1.     State Proceedings

On August 23, 2007, Mr. Maze filed a pro se petition for post-conviction relief. *Maze v. State*, No. M2008-01837-CCA-R3-PC, 2010 WL 4324377, at *1 (Tenn. Crim. App. Nov. 2, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011). In the petition, Mr. Maze argued that he was denied the effective assistance of counsel at trial. *Id.* Specifically, he contended that trial counsel (1) failed to make an offer of proof regarding the testimony of Dr. Yazbak; (2) failed to consult with a qualified medical expert regarding imaging evidence of the victim's neurological damage; and (3) failed to present a qualified medical expert to contradict the State's medical evidence regarding causation of the victim's brain and neurological damage. *Id.*

- 14 -

He also filed a petition for a writ of error coram nobis in October 2007, "claiming that he had discovered medical evidence that his son died as a result of coagulopathy originating from birth-related trauma or other disorders, not child abuse." *See Maze v. Lester*, 564 F. App'x 172, 174 (6th Cir. 2014), *cert. denied*, 574 U.S. 1028 (2014); *see also Maze*, 2010 WL 4324377, at *1, *28-30. Mr. Maze attached to the writ the affidavits of two physicians—a pediatric neuroradiologist, Dr. Patrick Barnes with Lucile Packard Children's Hospital, and a forensic pathologist, Shaku S. Teas—both of whom "opined that there was nothing in the reviewed medical evidence that was specific for, or characteristic of, non-accidental injury." *Maze*, 564 F. App'x at 174. Mr. Maze "averred that he [had] only recently discovered this evidence and did not know of its existence at the time of his trial." *Id.*

An evidentiary hearing on the post-conviction and error coram nobis petitions was held on June 9, 2008, where Mr. Maze presented testimony from Dr. Barnes, Dr. Yazbak, and his trial attorney. *Id.* at 174-75. "The physicians' testimony supported a theory that [the victim's] injuries were not caused by SBS, but rather were non-abusive in origin." *Id.* at 175.

Dr. Barnes testified that there had "been significant changes in medical literature concerning [SBS] since 1998 and that 'evidence-based medicine' is now applied rather than the triad of retinal hemorrhages, subdural hemorrhages, and brain injury (encephalopathy)." *Maze*, 2010 WL 4324377, at *25. According to Dr. Barnes, he had reviewed "the victim's MRIs, CT scans, x-rays, and medical history," which led him to determine "that under both the old and new diagnostic standards, the damage to [the victim's] brain was not characteristic of SBS[,]" and "[h]e was of the opinion that [the victim's] injuries were not a result of non-accidental trauma." *Maze*, 564 F. App'x at 175. Dr. Barnes indicated his disagreement with the "doctors from Vanderbilt [who had] ruled out venous thrombosis in their reports[.]" *Maze*, 2010 WL 4324377, at *17. Dr. Barnes believed that "the victim may have suffered from coagulopathy, a bleeding or clotting problem, which caused the hemorrhages in his brain." *Id.* at *25. In Dr. Barnes's medical opinion, "the injury to the victim's brain . . . was consistent with a stroke." *Id.* Dr. Barnes also observed "that the victim had no injury to the neck or spinal cord, which was unusual for [SBS] 'because that's the weakest part of the head and neck.'" *Id.* Dr. Barnes "did not feel that the victim in this case had a fractured clavicle," but he "agreed that the shaking of an infant could cause the fracture." *Id.* at *18.

Nonetheless, Dr. Barnes admitted that the victim's case, although unusual for SBS, "was consistent with battered child syndrome." *Id.* at *25. He further acknowledged that he "did not consider the photographs of the victim's bruises in his findings"; the "other evidence of traumatic injury to the victim because 'it[ was] not within [his] area of expertise

or practice with regard to the ethics in medicine'"; nor "the victim's history as part of his diagnostic process." *Id.* Lastly, "Dr. Barnes admitted that his testimony was contradictory to other medical literature on the subject and to what he had previously written in 1999." *Id.*

Dr. Yazbak then testified. Importantly, Dr. Yazbak opined that the total pediatric history must be examined when diagnosing infants and that a "diagnosis of inflicted head injury is a diagnosis by exclusion[,] . . . the last thing on the list." *Id.* at *19. Dr. Yazbak testified that he reviewed Mrs. Maze's pregnancy records and that he observed several risk factors with regard to her pregnancy, "including the mother's age, high blood pressure, and gestational diabetes." *Id.* at *18. Dr. Yazbak also testified about the victim's complications in utero and accompanying his premature birth, noting an "intrauterine growth retardation," a short umbilical cord twice wrapped around the victim's neck, and the lack of sufficient amniotic fluid. Dr. Yazbak further noted that, post-birth, the victim suffered from jaundice, tachycardia, and anemia. *Id.*

Regarding the administration of the Hepatitis B vaccine to the victim, Dr. Yazbak observed that, after the first dose, the victim gained five ounces overnight and had a sizeable increase in head circumference in the subsequent days. *Id.* at *18-19. To Dr. Yazbak, this weight gain and increase in head size indicated "some kind of a thrombosis happened in the nursery." *Id.* at *20. He also noted that the victim's second dose was administered earlier than recommended. *Id.* at *19. However, Dr. Yazbak could not say "if any of the victim's problems on May 3, 1999, could be attributed to the Hepatitis B vaccine." *Id.*

To Dr. Yazbak, although he was not a neuroradiologist, the victim's hospital records on and after May 3, 1999, indicated that "the victim 'may have had some minute strokes, some thrombosis, some problems with the vascular [system] . . . in the texture of the brain, not outside of it.'" *Id.* (second alteration in original). Moreover, "Dr. Yazbak testified that in addition to brain and retinal hemorrhages, the victim in this case 'had other very striking intra cranial events and intra cranial problems'" that were "more consistent with epoxy [sic] injury." *Id.* at *19-20. However, as far as he was concerned, "if someone had shaken the victim hard enough to cause the 'devastating intercranial findings,' the victim's neck would have been injured." *Id.* at *20. He further opined that "a series of vaccinations" given to the victim after his May 3 hospitalization "would increase [his] seizures and could cause his eventual death[,]" which Dr. Yazbak attributed to liver disease. *Id.*

Dr. Yazbak conceded that "there was no evidence based on the CT scan that the victim had extra collections of blood or cerebral spinal fluid prior to May 3, 1999, and no evidence of any birth related subdural hemorrhage." *Id.* In addition, he "admitted that

there were no symptoms associated with an altered neurological status between birth and May 3, 1999." *Id.* Moreover, Dr. Yazbak acknowledged that "medical literature recognizes that when there is a collapse," like the victim's on May 3, 1999, "the only way in which it would happen would be by abuse" if there were no other "well-documented traumatic event." *Id.* Still, Dr. Yazbak believed that, since "all of the things needed to rule out some other causation were not done[,]" it was wrong to attribute the victim's collapse and subsequent death to abuse. *Id.*

Trial counsel was next to testify. Trial counsel said that,

in preparation for [Mr.] Maze's trial, he consulted with a pediatric radiologist (Dr. Boulden) and sent him a copy of the victim's x-rays (not the MRIs, CT scans, or retinal photos), but he did not call Dr. Boulden as a witness because the doctor's conclusion that the victim suffered a fractured clavicle would not have supported the defense. [Trial counsel] also consulted with another expert, Dr. Cleland Blake, a pathologist, about the evidence (including the MRIs and scans) but likewise decided not to call him as a witness because he was of the opinion that the victim suffered from child abuse or non-accidental trauma. Although [trial counsel] attempted to call Dr. Yazbak as an expert witness at trial (to testify about the adverse effects of Hepatitis B vaccines), [trial counsel] recalled that he never presented an offer of proof in this regard at trial and his belated pre-trial, in-chambers motion was denied by the trial court, which treated the issue as a discovery notification matter. [Trial counsel] could not recall if he presented the trial court with [Dr.] Yazbak's affidavit or a letter from him as a proffer of his testimony. [Trial counsel] testified that after conducting his own research in preparation for trial, he arrived at the conclusion that Dr. Yazbak's theory was "not something that [he] was going to readily be able to support through his testimony" because it was not in the mainstream of medical opinion at that time.

*Maze*, 564 F. App'x at 175; *see also Maze*, 2010 WL 4324377, at \*21-23.

Regarding evidence of the victim's clavicle fracture, trial counsel was asked if, from "a layperson's standpoint," he thought he saw a fracture "on the x-rays that were used at trial" and shown to the jury. Trial counsel said that he "absolutely did" and agreed that it, in fact, "was fairly readily identifiable."

Thereafter, the original post-conviction court issued separate orders denying Mr. Maze's petitions for post-conviction relief and for the writ of error coram nobis. *Maze*,

- 17 -

564 F. App'x at 175. On appeal, this court affirmed the denial of all post-conviction relief. *Maze*, 2010 WL 4324377, at *1. Specifically, this court held that Mr. Maze failed to show that trial counsel's assistance, relative to either presentation of Dr. Barnes or Dr. Yazbak, fell below acceptable standards or that he was prejudiced by any aspect of his trial counsel's performance. *Id.* at *23-28. With regard to Mr. Maze's petition for a writ of error coram nobis, the post-conviction court determined that Dr. Yazbak's testimony was not "newly discovered evidence" because Mr. Maze was aware of Dr. Yazbak at the time of trial. Then, this court, like the original post-conviction court, determined that Dr. Barnes's testimony was cumulative of other evidence presented at trial and was not "newly discovered evidence" so as to qualify for the writ; rather, the testimony "serve[d] no other purpose than to contradict or impeach the evidence adduced during the course of the trial." *Id.* at *28-30.

## 2. Federal Proceedings

On May 23, 2011, Mr. Maze, proceeding pro se, filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Tennessee. *Maze v. Lester*, No. 3:11-0483, 2011 WL 3758608, at *1 (M.D. Tenn. Aug. 25, 2011). Therein, Mr. Maze raised several claims alleging that trial counsel was ineffective. *Id.* As relevant here, Mr. Maze argued that trial counsel was ineffective by failing to submit an "Amicus Brief" that "was going to be favorable evidence for" him. *Id.* Specifically, the Amicus Brief included a chronology of events that had been constructed by Mrs. Maze from the time of the victim's birth until his death. *Maze*, 564 F. App'x at 177. Also, as part of his Amicus Brief, Mr. Maze submitted a compilation, gathered by Mrs. Maze, of affidavits from eleven medical experts. *Id.* These affidavits, including one from both Dr. Barnes and Dr. Yazbak, "set forth various non-abusive causes and explanations for [the victim's] injuries and death." *Id.* Specifically, "the Amicus Brief include[d] the opinions of nine additional physicians who, with varying degrees of certainty, suggest[ed] other possible causes of death not previously advanced in [Mr.] Maze's post-conviction arguments—such as hepato-cellular necrosis or liver damage, anti-convulsant drugs, vaccinations, and severe anemia." *Id.* at 179. In addition, Mr. Maze argued that trial counsel should have consulted with a neurologist, rather than a radiologist. *Maze*, 2011 WL 3758608, at *1. The district court denied Mr. Maze's petition in its entirety and declined to issue a certificate of appealability. *Id.* at *2-4.

As to Mr. Maze's "Amicus Brief" claim, the district court held that it had not been fully exhausted in state court and that no fundamental miscarriage of justice occurred to excuse the default. *Id.* at *2-3. The district court noted that, although Mr. Maze claimed he was actually innocent of the charges, "[h]e ha[d] offered nothing . . . to place his guilt in serious doubt." *Id.* at *3. As for the allegation regarding trial counsel's failure to consult

- 18 -

with a neurologist, the district court held that the claim had been fully exhausted and that the record supported this court's determination "that counsel had, under the circumstances, acted reasonably and in a manner that did not prejudice the defense." *Id.* at *4. In so holding, the district court observed,

> At the post-conviction evidentiary hearing, counsel testified that he had consulted with Dr. Boulden, a pediatric radiologist, and Dr. Blake, a pathologist, about the victim's injuries and the cause of his death. These physicians were not called as defense witnesses because they would not support the defense theory of the case. . . . Counsel also was unsuccessful in having Dr. Yazbak, a pediatrician, testify for the defense.
>
> Counsel was assisted at trial by Toni Blake who had expertise in defending against allegations of child abuse. . . . Counsel vigorously cross examined the prosecution experts as to other possible causes of the victim's death.

*Id.*

Following appeal of the district court's determination to the Sixth Circuit Court of Appeals, the Sixth Circuit issued an order granting a certificate of appealability as to the issues raised by Mr. Maze in his habeas corpus petition. *Maze*, 564 F. App'x at 176. The Sixth Circuit, like the district court, found the "Amicus Brief" claim to be procedurally defaulted, given Mr. Maze's "failure to present 'the same claim under the same theory' to the state and federal courts[.]" *Id.* at 179 (citing *Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004)). The Sixth Circuit noted that this claim "advanc[ed] different and expanded factual theories as to the cause of [the victim's] death." *Id.* Mr. Maze argued that, even if this claim was procedurally defaulted, the "actual innocence" exception applied to equitably toll the statute of limitations. *Id.* at 180. Mr. Maze contended that he had

> "new reliable evidence" of actual innocence, asserting that in the last ten to fifteen years new scientific studies have discredited the previous consensus that infants exhibiting a triad of symptoms are the victims of SBS; rather, it is now known that there are other causes of this triad or its components, including accidental injury, non-traumatic medical conditions, and diseases.

*Id.* In addition to this medical literature, he cited Dr. Barnes's testimony at the post-conviction hearing. *Id.*

- 19 -

The Sixth Circuit rejected this argument of actual innocence, determining that Mr. Maze failed to show that it was "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt[.]" *Id.* at 181 (quoting *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012)). The federal appellate court "acknowledged the controversy surrounding a diagnosis of SBS and the ongoing debate in the scientific community regarding the accuracy of the SBS triad[,]" but it observed that "[t]he debate continue[d] and d[id] not suggest that the presence of the triad symptoms [in this case was] inconsistent with abuse." *Id.* at 180 (citations omitted). Significantly, here "'the diagnosis [of SBS] was not based solely on the [victim's] brain injuries' or triad symptoms, but evidence of blunt force trauma as well." *Id.* (quoting *Lutze v. Sherry*, 392 F. App'x 455, 459 (6th Cir. 2010)). The Sixth Circuit continued,

> Although Dr. Barnes reviewed [the victim's] medical records, CT scans, MRI images, and x-rays, he testified that he did not review any of the photographs taken of the victim—which showed bruising to [the victim's] head and abdomen—or any other evidence of traumatic injury to the victim, including a fractured clavicle. The prosecution's experts agreed that considering all of these significant injuries, there was no explanation other than abuse that would account for [the victim's] condition. Thus, there was "ample testimony provided at trial demonstrating the severity of [the victim's] abuse that extended well beyond being shaken."

*Id.* at 180-81. The court also mentioned the prosecution's "non-medical evidence" indicating guilt, which included "inconsistencies in [Mr.] Maze's behavior and statements to the police and his concession, after earlier denials, that he might have shaken or 'jostled' [the victim] in an attempt to revive him and thus could have caused the injury to [the victim's] clavicle." *Id.* at 181.

As for Mr. Maze's claim that trial counsel was ineffective for failing to consult with a neurologist, the Sixth Circuit determined that, although the claim had been fully exhausted in the state court post-conviction proceedings, Mr. Maze had failed to show that this court's "prejudice determination constituted an unreasonable application of federal law." *Id.* at 181-82. The court concluded that Mr. Maze had failed to show a substantial "likelihood of a different result." *Id.* at 183. Citing to this court's explanation in Mr. Maze's state post-conviction proceedings, the Sixth Circuit observed that, "although trial counsel did not consult with a neurologist such as Dr. Barnes, counsel presented a significant amount of medical testimony in an attempt to demonstrate that [Mr.] Maze did not abuse the victim and, alternatively, that the victim's brain injury did not cause his death." *Id.* Accordingly, the Sixth Circuit affirmed the district court's denial of relief. *Id.*

### D. Current Post-Conviction Proceedings

On December 12, 2023, the District Attorney, through its Conviction Review Unit ("CRU"), filed notice of its intention "to remedy" the Petitioners' convictions "by utilizing the appropriate procedural process to bring this matter within the jurisdiction" of the post-conviction court pursuant to Tennessee Supreme Court Rule 8. According to the District Attorney, his office had conducted "an extensive investigation" and concluded that there was "clear and convincing evidence establishing [the Petitioners] were both convicted of crimes they did not commit." Attached to this notice was an extensive report prepared by the CRU, and included with this report were affidavits from six medical professionals: Dr. Lawrence Hutchins, Dr. Michael Laposata, Dr. Carla Sandler-Wilson, Dr. Franco Recchia, Dr. Darinka Mileusnic-Polchan, and Dr. Megan L. Avery. These respective affidavits, each signed in either November or December of 2023, listed the professional's qualifications and the materials reviewed, and each professional adopted the conclusions made in their attached "expert reports" of various lengths. These reports appear to have been prepared between July and November of 2023. Dr. Julie Mack's report, prepared in October of 2023, was also attached to the notice, but no affidavit accompanied that report.

On the same day as the CRU's notice was filed, Mr. Maze filed a motion to reopen his petition for post-conviction relief pursuant to Tennessee Code Annotated section 40-30-117(a)(2) "based upon new scientific evidence establishing that [he was] actually innocent of the . . . offenses for which [he] was convicted[.]" Mr. Maze relied on opinions from multiple experts that determined "it was a medical issue that caused the illness . . . [the victim] was suffering from," which led to the victim's eventual death, and not any act committed by Mr. Maze. According to Mr. Maze, "[t]hese expert opinions are based, in part, on new medical research showing that there are non-traumatic causes (such as stroke, possibly caused by medical disorders) for symptoms like [the victim's] which at the time were presumed by doctors to be evidence of abuse." Mr. Maze concluded that this new scientific medical evidence clearly and convincingly established his actual innocence "because the State's theory of the case [at trial, AHT,] was wrong[,]" and therefore, his convictions for first degree felony murder and aggravated child abuse should be vacated. No affidavits were attached to Mr. Maze's motion to reopen his petition for post-conviction relief.

Three days later, on December 15, 2023, Mrs. Maze filed her first petition for post-conviction relief, noting that her guilt "depend[ed] on [Mr. Maze's] having assaulted [the victim.]" She requested that the court vacate her reckless aggravated assault conviction due to Mr. Maze's actual innocence because "[t]he foundations of [the victim's] SBS diagnosis no longer align with modern science[.]" She also cited multiple expert opinions and submitted that Tennessee Code Annotated section 40-30-102(b)(2) provided

- 21 -

a basis for tolling the statute of limitations because "new scientific evidence establish[ed] that [she was] actually innocent of the offense . . . for which [she] was convicted[.]"

The State, by and through the District Attorney, filed a response to the Petitioners' requests for post-conviction relief. The District Attorney admitted the facts set forth in the petition and agreed that the appropriate remedy was for the court to vacate the Petitioners' convictions.

The post-conviction court held a two-day evidentiary hearing on the Petitioners' pleadings beginning on March 26, 2024. At the hearing, the Petitioners' allegations of fact in support of their actual innocence claims were endorsed by the District Attorney. The parties also presented the testimony of seven medical professionals from various institutions across the country, all of whom were declared experts in their respective fields.[4] The parties argued that the new scientific evidence presented through these experts' opinions constituted evidence of the Petitioners' actual innocence, specifically by showing that (1) the victim's brain and retinal bleeding were not indicative of abuse, (2) the victim did not suffer a broken clavicle, (3) any bruising or skin discoloration noted on the victim was "prematurely and incorrectly diagnosed as evidence of abuse," and (4) there existed "better medical explanations" for the victim's symptoms and ultimate death than the diagnosis of SBS, particularly some kind of stroke.

Dr. Darinka Mileusnic-Polchan testified that she served as Chief Medical Examiner for Knox and Anderson counties and as Chief Medical Officer for the Regional Forensic Center, Knox County, and she was declared an expert in forensic pathology. Dr. Mileusnic-Polchan stated that, in preparation for the hearing, she had reviewed the victim's autopsy report, including photographs and histological slides, medical records from both Mrs. Maze and the victim, and any prior testimony of doctors from the various proceedings that had been provided to her.

Dr. Mileusnic-Polchan reviewed the autopsy photographs, and in her opinion, "they did not reflect [an SBS] diagnosis." She further observed that the victim had "two distinct lesions in his brain" and that SBS "never presents like that." Rather, according to Dr. Mileusnic-Polchan, there would be evidence of neck and brainstem injuries due to shaking—which were not present in the victim's case—but no "impact on the head." While no direct lesion would be present, there might be evidence of an "anoxic brain injury[,]" with or without "tearing of the bridging veins on top of the head," due to oxygen

---

[4] The Petitioners also presented brief testimony from the investigating officer, Kristen Vanderkooi, regarding how the investigation and charging decision were driven by the definitive diagnosis of abuse. Because this testimony did not constitute "new scientific evidence," the post-conviction court declined "to put any weight or value on her testimony."

deprivation. However, there was no anoxic brain injury present in the victim, and therefore, SBS could be excluded.

Regarding the two lesions seen on the victim's brain, Dr. Mileusnic-Polchan determined that those were not inflicted by blunt-force trauma given her observations of destruction, or lack thereof, to the several layers of the victim's brain; the absence of a "membrane on top of the brain" indicative of substantial brain hemorrhaging; the lack of "residual hemosiderin in the eyes" indicative of retinal hemorrhaging; and no evident damage to the victim's scalp. While she commented that Dr. Levy's autopsy report noted "hemosiderin in soft tissue behind the eyes[,]" she thought this was a mistake because there was no corresponding slide from the victim to confirm this, only a standard slide. In her opinion, the lack of hemosiderin in the eyes meant that the original treating doctors in this case "overstated" the amount of retinal hemorrhaging. Although retinal hemorrhaging was initially only associated with trauma, articles regarding new etiologies began being published in the 1990s and 2000s, an admission which prompted the post-conviction court to note that Mr. Maze's trial occurred in 2004. Dr. Mileusnic-Polchan clarified that this view "became actually more prominent in the 2000s, and especially by 2010 and in the last, kind of couple [of] decades[.]" She confirmed that the "bilateral subconjunctival hemorrhages" present in the victim were abnormal for SBS. She then confirmed "that it was inaccurate and misleading for Dr. Starling to say that trauma was the only cause of retinal hemorrhaging[,]" even in 2004.

Moreover, the shape of the lesions in the victim's brain indicated a stroke to Dr. Mileusnic-Polchan because, when smaller blood vessels in the brain are blocked from a stroke, the resulting lesions are "frequently wedged-shaped," as she observed in the victim's case. Based upon the presentation of the victim's brain, she opined that he "probably [suffered] a thromboembolic event[,]" meaning that a clot formed somewhere in the victim's body, "probably in the heart" due to the victim's "[s]upraventricular tachycardia," which broke off and traveled through his bloodstream to his brain.

Additionally, Dr. Mileusnic-Polchan said that the victim's overall health at the time of his death was poor, noting the presence of "inflammation throughout" the victim's lungs and his "extremely unhealthy liver . . . , kind of acute chronic hepatitis[.]" In her opinion, this provided further evidence of "some sort of systemic disorder" that, in addition to "his ineffective heartbeat," made him "prone to create these blood clots[.]"

Dr. Mileusnic-Polchan explained that "any severe trauma can cause retinal hemorrhag[ing,]" including a "very difficult vaginal birth," as well as "a lot of other medical conditions, whether they're metabolic or blood dyscrasia, meaning some clotting issues," and "some other blood disorders," such as leukemia and meningitis. She also noted

that she "didn't see [a clavicle fracture] on the x-rays done at the time of the autopsy," that the victim "did not have rib fractures that [were] classically present with [SBS,]" that no other fractures were observed, and that she did not see any abdominal bruising from the photographs taken at the hospital. However, when asked by the post-conviction court if one of the causes of retinal hemorrhaging was SBS, Dr. Mileusnic-Polchan agreed that it was. Moreover, Dr. Mileusnic-Polchan later confined her expertise to "the pathology and especially [the] microscopic presentation," and she noted that she could not "comment much" on the x-rays or the victim's "clinical presentation."

Dr. Mileusnic-Polchan qualified her "expert opinion to a degree of medical certainty" that she could "rule out abuse as a cause for the victim's condition." Dr. Mileusnic-Polchan maintained that she believed the slides of the victim's brain were conclusive as to her findings. She further indicated that she had presented the victim's case for an internal office peer review, and her team had "reached a unanimous conclusion that [the victim] was not a shaken baby[,]" but "[t]his was actually a case of a stroke, probably thrombosis strokes."

Dr. Mileusnic-Polchan believed that Dr. Levy had "based his opinion on previous conclusions [drawn] by Dr. Starling rather than [on] his own analysis[.]" However, she opined that this was not uncommon in her professional experience as medical examiners frequently rely "a lot on clinical information." She observed that there was "a lot of room for interpretation [in the victim's case,]" reasoning that "there were not good original photos taken" at the time of the victim's injuries on May 3, 1999, and that CT scans and MRIs at the time were not as good as those produced today, "so it was really hard to discern what was tra[u]ma and what was not." She opined that Dr. Levy's inaccurate SBS conclusion likely occurred because "he was just too busy to really dedicate enough time to study this case thoroughly." Ultimately, Dr. Mileusnic-Polchan disagreed with the prior assertions made at trial that "the only reasonable cause [of] the bleeding in [the victim's] brain was a sever[e] acceleration/deceleration injury[,]" and further disagreed that the victim suffered "a blow." At the conclusion of Dr. Mileusnic-Polchan's testimony, the following exchange with the post-conviction court took place:

[DR. MILEUSNIC-POLCHAN]: And I am almost certain if I were to bring Dr. Levy here and just kind of slow him down maybe just a minute –

THE COURT: There is no way you can say that. Really? What you're about to say.

[DR. MILEUSNIC-POLCHAN]: I – I think that any pathologist looking at the brain slides.

- 24 -

THE COURT: You are going to be able to say that I can bring in the doctor who testified and did the autopsy and he's going to admit he was wrong?

[DR. MILEUSNIC-POLCHAN]: Well. It happened, not with Dr. Levy, but with other pathologists.

THE COURT: And you know that? That Dr. Levy would –

[DR. MILEUSNIC-POLCHAN]: No. Well, I don't know with certainty. No, I don't know with certainty.

Dr. Joseph Scheller, an expert in pediatric neurology and neuroimaging, prepared a report in the victim's case based upon his review of the trial testimony and the medical records, which included the radiological images done on the victim's brain in May 1999 and the doctor's notes from that same time period. He found that the victim "presented in very dramatic life-threatening catastrophic neurologic illness at about five or six-weeks of age and that was due to the fact that he had suffered a stroke." He noted that this presentation, which did not include any injury to the scalp or skull, made it "much less likely" that the victim "suffered an impact injury to the head on or around . . . May 3rd of 1999." The post-conviction court asked Dr. Scheller to expound on what he meant by "less likely," and Dr. Scheller replied, "It's not out of the realm of possibility[,] like it is unlikely."

In an attempt to discount the allegation of shaking in the victim's case, Dr. Scheller noted that the victim, who was "very, very small" and lacked "head control[,]" did not have a "whiplash-type of injury," nor was there evidence of any rib fractures. Further, Dr. Scheller stated that, while "the clavicle is a tough bone to assess" given its shape, he "did not see evidence of a clavicle fracture." He noted that, if the victim's clavicle had been broken "a week or two or three [weeks] before [the x-ray]," there would have been evidence of "new bone" forming as it healed, which he also did not see on the victim's x-ray.

Dr. Scheller noted that the medical community over the last fifteen to twenty years had learned an incredible amount in cases such as the victim's, that MRI tests were likewise far superior in the present day, and that there was now widespread use of ultrasound imaging. Returning to his finding that the victim suffered a stroke, he explained that the victim was born prematurely, which increased the likelihood of a stroke; there were "inherited conditions that [the victim] was never tested for that" could have made "him more likely to clot"; and there were "two other[] conditions that [the victim] seemed to have" making his blood thicker—anemia and infection.

- 25 -

On the victim's brain imaging from May 3, 1999, Dr. Scheller noted two areas from which "one would conclude" that the victim had suffered a recent blood clot that was "readily apparent," as well as "a slight hint [that] . . . maybe there is a little bit of [a] blood clot" in other areas. On the victim's brain imaging from May 6, 1999, the area Dr. Scheller observed three days earlier was now "much thicker, much larger and much more dramatic." He termed this "a very, very impressive progression of this blood clot," which was not suggestive of SBS or other trauma because the clot would not have grown under those circumstances. According to Dr. Scheller, this May 6 scan suggested "thrombosis" or "clots in the veins of the brain." When asked if the clot present in the victim's scan from May 6 could have been caused by abuse, Dr. Scheller responded that it was "[v]ery, very unlikely. It is in the realm of possibility, yes. But it—that's not the first thing you think of. . . . [A] stroke is typically a circulation problem from within, not a problem from with out." On the victim's brain imaging from May 12, 1999, Dr. Scheller observed blocked blood flow in "the vertical part of the T," representing the "large vein that's bringing the blood from the front of the brain to the back so that it can get back to the heart." This likewise was not consistent with AHT, in Dr. Scheller's opinion. According to Dr. Scheller, the victim presented with "cardiorespiratory arrest . . . due to venous strokes[,]" which is typically a slower process, and he "did not see evidence of an arterial stroke in [the victim's] case."

He opined that the victim's retinal hemorrhaging was also indicative of a stroke. He explained that retinal veins are very delicate and are directly connected to the blood vessels in the brain; thus, when larger blood vessels are blocked in the brain, it would cause the retinal veins to "leak."

Regarding the diagnosis of abuse, Dr. Scheller believed that Dr. Starling made a rush to judgment in the victim's case, calling it "incredible" that she could say "this [was] inflicted trauma and the mechanism [was] from a rotation" before reviewing much of the imaging and "detail[ed] bloodwork." He believed that Dr. Starling's early diagnosis "impacted the ability of other doctors treating [the victim] to consider whether these other causes may have contributed to his problems[.]" When pressed by the post-conviction court on whether he could say with "medical and scientific certainty" that the victim's condition was not the result of abuse or trauma, Dr. Scheller replied, "I would say the much more likely diagnosis is that he had a[] medical condition and that medical condition [was a] stroke and whatever triggered the stroke." He also clarified that his opinion at the time of Mr. Maze's trial in 2004 would "probably" have been "the same thing."

Dr. Michael Laposata, Chair of the Department of Pathology at the University of Texas in Galveston, and an expert in coagulation and laboratory tests, testified regarding

"underlying diseases that mimic child abuse," specifically blood disorders. He became interested in learning about the mimickers when it was "realized that of [twenty] children who looked beaten, [nineteen] of them were[,]" but there was that one child who was wrongly diagnosed. There are "three major categories . . . called mimics of child abuse": bleeding disorders, skin changes, and bone abnormalities. Dr. Laposata said, "[T]his is a very well-known thing that emerged over the past [twenty] something years because of the false imprisonment of innocent people." His first study on the topic was published in June 2005. Dr. Laposata was convinced "with absolute certainty that there was an underlying disease" in the victim's case.

Dr. Laposata reviewed the lab work and medical records from both the victim and Mrs. Maze. He noted numerous health problems Mrs. Maze experienced during her pregnancy, including gestational diabetes, a "fatty liver," and some concern that she suffered from an autoimmune condition known as "autoimmune hepatitis." He posited, "[T]here are several things that are made by the patient who has an autoimmune disease that can go across the placenta to the baby and promote clotting." However, he could not "point to medical evidence" that indicated "exactly what [Mrs. Maze] had." He further noted that Mr. Maze would also have to have these same traits for them to have been passed to the victim. However, adequate testing was not done to establish this one way or the other.

Dr. Laposata noted that the victim suffered from a fast heartbeat that "got worse after birth[,]" which was indicative of "serious signs of illness." Dr. Laposata also compared bloodwork done on the victim at birth with that done following his hospitalization on May 3, 1999, and he observed that the victim lost "two-thirds of his red blood cells[,]" which would have made it difficult for him to take in enough oxygen to breathe. If this had been caused by a bleed, Dr. Laposata explained that all three types of blood cells, not just red blood cells, would have been diminished. He also noted that the victim's red blood cells were "all misshapen." As the victim "got more and more unable to carry enough oxygen because of his terrible anemia, he got more and more fussy until he finally became unresponsive." He thought it was "unquestionable" that "there [was] an underlying disease here about red blood cells," although without further examination of the victim's bone marrow, the cause was indeterminate. He could not reconcile why further testing was not ordered to "fully evaluate the risk for clotting in [the victim]." Nonetheless, he agreed with the assertion that these observations of the victim's red blood cells pointed away from abuse.

Dr. Laposata believed that a clot could have explained the victim's presentation, including the retinal hemorrhaging. However, he noted that there remained

a lot of controversy about whether there was a clot in the major vein that goes right under the skull in the middle front to back. And some say it's there and some say it [is not]. The trouble is that if that was really there, it explained virtually everything in the [victim's] brain. And that would be hard to find at autopsy. And it's easy to find the clot confusing.

Some people read the imaging study as interval thrombosis, meaning the clot was there and then it wasn't there, then it was there. Basically it's a stroke-like [e]ffect that will cause damage to the brain.

Dr. Laposata lastly testified that it was "incorrect" to assert that AHT was the only explanation for the victim's condition.

Dr. John C. Hunsaker, III, a retired associate medical examiner and a retired professor of pathology, testified as an expert in forensic pathology. Following his review of the medical records in this case, he concluded that the victim "did not die of [SBS]" because "there was no scientific or medical basis to draw that conclusion." Noting that the victim did not die until eighteen months after the initial hospitalization, Dr. Hunsaker believed that "Dr. Levy based his autopsy findings on the conclusions of clinicians in the remote past rather than any findings he observed at autopsy." He reasoned that "there was nothing that Dr. Levy observed at [the victim's] autopsy that could lead him to state with a reasonable degree of medical probability that the cause of death" was SBS. Dr. Hunsaker said that the same findings "could [have been] explained as coming about from other reasons and nontraumatic reasons."

Dr. Hunsaker agreed that the "triad of symptoms" indicative of SBS—subdural bleeding, retinal hemorrhaging, and encephalopathy—were present in the victim's case, although he did not believe this was dispositive of a diagnosis. He noted that recent studies concluded that "each" of these symptoms could stem from natural causes and conditions. Dr. Hunsaker found the victim's "rapid increase in head circumference" to be concerning for swelling and "the accumulation of fluid inside and around the brain." He opined that infants "with a large head circumference could be predisposed to retinal hemorrhaging or subdural hemorrhaging." While much of this information had been collected over the last ten years, "[t]he process ha[d] been going on longer[.]"

Dr. Hunsaker confirmed his belief that "based upon the information" presently known to the medical community, "a stroke [was] a more likely explanation for [the victim's] hemorrhaging in this case than trauma[.]" He further noted that he "typically" would expect to see some evidence of external injuries in cases of suspected trauma, like injury to the scalp or contusions, but none were evident in the victim's case. Dr. Hunsaker

also noted that, in SBS cases, "it's much more likely that there is going to be damage to the structures of the neck rather than bleeding and inside of the skull and within the eyeballs." Having reviewed the reports of the other experts involved in this case, Dr. Hunsaker confirmed that he found "their ultimate conclusions to be reasonable" despite potentially not "agree[ing] with all of their findings[.]" He stated that it could be "very difficult" to determine what caused the victim's death with such a time difference between the injury and the autopsy, but he believed it was "reasonable to conclude that various metabolic and conditions related to clotting of blood" explained the changes in the victim's brain that led to the victim's death. He lastly confirmed that, in his opinion, it was "possible to a degree of medical certainty to rule out [the victim's] original diagnosis of [SBS.]"

Dr. Carla Sandler-Wilson, an attending neonatologist at Centennial Medical Center in Nashville and an expert in neonatology, testified that she reviewed Mrs. Maze's pregnancy records and all of the victim's medical records up to and including the duration of his hospitalization in May 1999. She believed Mrs. Maze was diligent in her prenatal care but suffered multiple significant issues, including gestational hypertension, gestational diabetes, intrauterine growth restriction, low amniotic fluid, and elevated liver enzymes. The victim was born prematurely at thirty-four weeks of pregnancy and was "small for gestational age." She noted that "a good proportion" of babies found to have sinus venous thrombosis, or "a clot in a major [blood] vessel that drains the blood from the brain[,]" were the product of premature birth stemming from pregnancies complicated by gestational diabetes and gestational hypertension. All of these conditions were present surrounding the victim's birth, leading Dr. Sandler-Wilson to opine that the victim was "definitely at an increased risk" for clotting issues and brain bleeds. Also, while the victim was in the hospital, he displayed "[h]yperbilirubinemia or jaundice[,]" as well as "supraventricular tachycardia."

Dr. Sandler-Wilson explained that it has been the standard for over fifty years to give "every infant after birth" an injection of Vitamin K to aid with infancy clotting issues. In the victim's case, she saw from the medical records that a Vitamin K injection had been "ordered," but there was no record of when or if the injection was actually given to the victim. This was important to Dr. Sandler-Wilson because the victim's presentation on May 3 was "almost identical to babies [she had] taken care of with Vitamin[] K deficiency bleeding who presented at six weeks of age with catastrophic brain bleeds and anemia." She also found the "massive growth" in the victim's head circumference over a two-week period "very concerning" and believed that further investigation should have been done as to the source of that growth. She further noted that "newborn screen[ing] is constantly being evaluated and updated on a regular basis."

Dr. Sandler-Wilson confirmed that, upon her review of the photographs taken following the victim's May 3, 1999 hospital admission, she observed bruises on the victim's face and abdomen. While she could not determine the cause of the bruises from looking at the photographs, she did not observe any corresponding internal injuries. In a case of SBS, she would expect to see bruising about the ribcage and sternum, which was not present in the victim's case. Although she testified that she was not a radiologist and did not interpret the actual images, Dr. Sandler-Wilson found the timing of the victim's reported clavicle fracture "weird" because it had apparently not been noticed on the other x-rays conducted in the more than twenty-four hours preceding its discovery. She further stated that fractured clavicles are rare in cases of SBS.

Dr. Sandler-Wilson believed that the victim had "some sort of viral syndrome going on" and that a metabolic disorder was a potential explanation for the victim's fever, vomiting, and fussiness. Dr. Sandler-Wilson opined that the SBS diagnosis made within two hours of his arrival in the emergency room "was a rush" to judgment and not reasonable. She further noted that "[t]here are many other diseases and disorders that can present and mimic [SBS]." She did not agree with a diagnosis of SBS based upon "today's research standards." When asked if she would have diagnosed the victim with SBS, she said, "Not on the available evidence that I had at the time."

Dr. Julie Mack[5] from Penn State Hershey Medical Center, an expert in diagnostic radiology, gave her opinion to a reasonable degree of medical certainty that "the imaging in [the victim's] case d[id] not have any . . . direct evidence" of severe trauma as the cause of the brain bleeding. She said "that a conclusion of severe trauma would be unsafe based on the imaging findings." According to Dr. Mack, a lack of significant bleeding in the victim's brain indicated that the "bridging veins" had not ruptured, which she would expect to see in a case of SBS. Dr. Mack stated that from the imaging she observed, the victim's brain bleeding "increased very significantly" while he was in the hospital following his May 3, 1999 admission, which likewise would not have occurred in an SBS case. She noted that she did not have all of the imaging in the victim's case, but she did not "see any evidence of displaced clavicle fractures on the imaging that [she had]" received. Dr. Mack agreed that "a stroke or other natural disease [would] be a plausible explanation of the bleeding that occurred over time in [the victim's] case[.]" She also agreed that, as of the present day, AHT was "a diagnosis of exclusion" and that further investigation "of other potential [diagnoses] that can [cause] bleeding" would be warranted.

_____

[5] We note that Dr. Mack's testimony was occluded by frequent "Zoom Malfunctions," and her affected explanations and findings were neither repeated nor clarified on the record at the hearing. The resulting gaps in the transcript prevented this court from reviewing some of the substance of her testimony.

Dr. Lawrence Hutchins, a retired neuroradiologist, maintained his status as an "emeritus physician with the Marshfield Clinic" in Wisconsin, where he had been "a permanent member" of the "child abuse team" for twenty-five years. He reviewed the CT scans from May 3 and May 6 of 1999 and the MRI from May 12, 1999, in the victim's case, as well as "the pertinent relevant medical records as they pertained to neuroradiology." From his review of the case, he did not believe that the victim "suffer[ed] inflicted trauma or accidental trauma[,]" but rather an "ischemic arterial stroke." He opined that the injury mechanism in this case was due to an arterial stroke, rather than a venous stroke, as he observed it to be arrayed in a typical arterial distribution pattern. He said that while he disagreed with the other experts who had diagnosed a venous stroke, such, nonetheless, was "a reasonable consideration." Dr. Hutchins stated that, in his opinion, the likelihood that the victim suffered inflicted brain trauma was "as close to zero as [one] will get in medicine."

In discussing various reasons for misdiagnosis, he noted that the CT request in the victim's case said "trauma," which would have framed the diagnostic tools in both performance and interpretation of the scan. Here, the images showed only a collection of "[e]xtremely small" subdural hematomas, and there was no evidence of contusions; moreover, the accumulation of blood seen in the victim's brain was not "seen early" as with a contusion, but it instead appeared "late" as with a stroke. In a case of AHT, there should be "at least some . . . primary traumatic brain injuries . . . in the breathing center in the brain stem[,]" which were not observed in the victim's brain. Dr. Hutchins noted that subdural hematomas could have many causes: "And [] trauma is obviously a cause of subdural hematomas and – and should be a consideration every time you see one. But subdural hematomas that are caused by trauma usually have associated other findings . . . such as skull fractures or scalp swelling." There was no "external evidence of trauma," such as a skull fracture or scalp swelling, in the victim's images. Here, there was "premature closure of the case[,]" in Dr. Hutchins' opinion. Dr. Hutchins indicated that, when Dr. Starling told the jury during Mr. Maze's trial that trauma was "a common cause of pediatric stroke[,]" she was incorrect.

During his testimony, Dr. Hutchins was asked, "Can you tell us some of the other causes that would have been known around the time that [the victim] presented in 1999/2000?" In response, he referenced a "rather limited" journal article published in 2000 that discussed bleeding abnormalities, motor vehicle accidents, and tumors as causes in infants who presented with subdural hematomas but lacked external evidence of abuse. He then noted that, in an article published nine years later, the list was far more expansive. He also explained that subdural hematomas can be birth-related and that birth was the most common cause for their presence in newborns. Dr. Hutchins believed that the cause of the victim's brain bleeding was "[a] birth related subdural hematoma[.]"

At the conclusion of the proof, counsel for Mrs. Maze asserted that the District Attorney's admission of the facts in the petitions was "controlling and they limit[ed] the fact finding mission that [the post-conviction] court ha[d] to conduct." Counsel then averred that the post-conviction court's "task [was] fairly easy[,]" which prompted the post-conviction court to respond, "So why did we have this hearing?" Counsel stated that the post-conviction court was bound by the parties' factual admissions but that, "obviously," application of the "the law [was] up" to the post-conviction court.

Counsel for Mr. Maze said, "There's a lot of theories that are [thrown] at the wall that are never actually connected to the evidence in this case, and that's what matters. It's why we actually brought doctors in to show you the imaging to say it doesn't fit." Counsel for Mr. Maze asserted that the experts who testified during the hearing only "disagreed on one issue, on whether it was a venous or arterial stroke[,]" and that "[t]here [was] no daylight between any of these doctors on whether this [was] inflicted trauma." Counsel for Mrs. Maze expounded upon this argument stating, "[I]t doesn't matter what the type of stroke was [twenty-five] years after the fact, it matters that they agree that it was more than likely some type of stroke and not abuse."

When asked if the testimony from these doctors at the hearing amounted to new scientific evidence, counsel for the Petitioners cited the studies since 2004 that had been referenced by the doctors at the hearing and explained, "[T]here has been significant development in the medical community's understanding of what causes the classic [SBS] triad, other than shaking." The post-conviction court asked the prosecutor if it would "be strong evidence if Dr. Starling had been consulted and came in and said [she] was wrong?" The prosecutor noted that the District Attorney had "consulted experts in every possible field that could be relevant to this case" and responded that Dr. Starling's testimony would "be biased evidence" not in tune "with the most updated science" because she had changed her field of practice.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and informed the parties it would issue a written ruling on the petitions. On April 25, 2024, the post-conviction court entered an extensive written order memorializing its findings of fact and conclusions of law as to Mr. Maze's claim of actual innocence. The court first detailed the procedural history of the case and provided a summary of each expert's testimony from the evidentiary hearing.

Relative to the procedural posture of Mr. Maze's motion to reopen, the post-conviction court noted that it "ha[d] already accepted the instant post-conviction claim for review" and that Tennessee law required one to "show[] clearly and convincingly that

- 32 -

one is actually innocent" in order to obtain relief.  Citing Tennessee Code Annotated section 40-30-117(a)(2), the post-conviction court "determined that [Mr. Maze's] basis for re-opening his original post-conviction relief petition under a new scientific evidence claim [was] appropriately filed" and timely.

Turning to the issue of Mr. Maze's actual innocence, the post-conviction court indicated that it was "limited in its role as a fact finder" due to the District Attorney's admission to all of the allegations.  The post-conviction court noted that, despite this, it "retain[ed] the equally important roles of determining credibility of the witnesses along with weighing and valuing the proof presented."  The post-conviction court also noted the lack of cross-examination of the experts at the evidentiary hearing and that the opinions stated therein remained untested and instead "were packaged as the wholesale truth."  The post-conviction court cited to previous proceedings in Mr. Maze's case—first quoting *Maze*, 2006 WL 1132083, at *1; and then quoting *Maze*, 564 F. App'x at 174—observing that "prodigious expert medical evidence" had been produced "to support [the] respective positions" of the parties and that "the 'devastating injuries' suffered by [the victim] ha[d] been chronicled at length."  The post-conviction court stated that it had "heard several learned voices opine on the medical evidence collected nearly twenty-five years ago" and that "old data was viewed with different perspectives."  The post-conviction court then observed that, while all of the experts presented at the hearing "did not believe the [victim's] injuries were trauma-inflicted[,]" they "disagreed with each other . . . , definitively asserted different etiologies . . . , and disagreed with unspecified medical 'opponents'[.]"  The post-conviction court classified the proof presented "as new ammunition in a 'battle of the experts[,]'" but it "diminishe[d] the value of the newly presented evidence where fresh opinions were offered but not probed" through cross-examination.  The post-conviction court concluded, "Courts should undoubtedly be the champion of justice and be willing to correct a wrongdoing wherever it may exist. However, in doing so, a court's main purpose and ultimate goal must be upholding the rule of law both constitutionally and statutorily."  Ultimately, the post-conviction court was "unconvinced the 'new scientific evidence' present[ed] substantially more than different opinions on extant proof."

The post-conviction court, quoting *Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *35 (Tenn. Crim. App. July 1, 2009), concluded that Mr. Maze had not "established by clear and convincing evidence that 'no jury would have convicted him in light of the new evidence' presented at this post-conviction hearing."  The court reasoned that "[d]iffering views ha[d] been provided in two different jury trials and in post-conviction proceedings" regarding the victim's cause of death; that now "additional experts ha[d] weighed in with their opinions"; that, "[o]bjectively, the facts remain[ed] the same as in 1999 when [the victim] was hospitalized and evidence was initially collected"; and

that "[s]ubjectively, opinions ha[d] been offered for more than two decades on the <u>same facts</u>." Accordingly, because the post-conviction court "[did] not find an injustice nor that [Mr. Maze was] actually innocent based on new scientific evidence[,]" it ruled that "the petition [was] dismissed." After concluding that the petition was dismissed, the post-conviction court instructed Mr. Maze that he had thirty days to appeal this decision pursuant to Tennessee Code Annotated section 40-30-117(c).

Observing that Mrs. Maze's claim for post-conviction relief "[rose] and [fell] on the merits of Mr. [] Maze's claim," the post-conviction court likewise "dismissed" her petition. That same day, the court filed a separate order in Mrs. Maze's case, referring to its "order detailing its denial of post-conviction relief" to Mr. Maze, and then denying relief to Mrs. Maze on the basis that "the cases were intrinsically tied to one another."

### E.    Appellate Proceedings

Both Petitioners filed timely notice of appeal documents pursuant to Tennessee Rule of Appellate Procedure 3. In Mr. Maze's case, this court filed an order on May 14, 2024, stating that Mr. Maze was required to receive permission from this court to appeal pursuant to Tennessee Code Annotated section 40-30-117(c) and Tennessee Supreme Court Rule 28, section 10(B). This court observed that there is no appeal as of right under Rule 3 from the denial of a motion to reopen a petition for post-conviction relief and that Mr. Maze's notice of appeal document did not otherwise comply with the statutory filing requirements for an application for permission to appeal. The court concluded that Mr. Maze's notice of appeal document would be dismissed for lack of jurisdiction unless he "complie[d] with [Code] Section 40-30-117(c) before the expiration of the applicable thirty-day filing deadline."

In accordance with this court's directive, Mr. Maze filed an application for permission to appeal on May 21, 2024, wherein he challenged the determination by this court, arguing that his appeal had been properly filed as a Rule 3 appeal as of right. The State, by and through the Attorney General in the proceedings before this court, filed an answer on June 20, 2024. By order dated July 9, 2024, this court consolidated the Petitioners' cases for review. In the order, this court also stated,

> Upon the filing of the record, briefing shall commence in accordance with the Rules of Appellate Procedure. In addition to any other issues the parties raise, Mr. Maze and the State shall address whether appellate review of the trial court's order denying him post-conviction relief is permissive or a matter of right. *Compare* Tenn. R. App. P. 3(b) (petitioner has right to appeal denial of post-conviction relief) *with* Tenn. Sup. Ct. R. 28, Sec. 10(B)

- 34 -

(petitioner must seek permission to appeal denial of motion to reopen).  Mr. Maze and the State may incorporate into their briefs the arguments already advanced in their respective application and answer already on file.

Thereafter, the appellate record was filed on August 14, 2024.

Then, in September 2024, the Petitioners moved to temporarily stay the appellate proceedings.  They requested that this court remand the case to the post-conviction court to consider a newly submitted affidavit from Dr. Levy, the medical examiner who performed the victim's autopsy and who testified at trial as to the nature and cause of the victim's death.  In this affidavit, Dr. Levy stated that he had recently reviewed the victim's medical records from birth until his death in October 2000, as well as Mrs. Maze's obstetric records, but he did not "believe many of these records" had been provided to him previously.  He also averred that he had "reviewed more recent reports from medical experts who have re-examined this case since [he had] last reviewed the case over two decades ago."  Based upon his review of this information, "as well as changes in medical opinions regarding [SBS] and improved knowledge regarding natural conditions present in [the victim] that increased the risks for sudden catastrophic neurologic events that are non-traumatic in origin," Dr. Levy recanted much of his trial testimony.  Specifically, he disavowed his prior determination that the victim suffered from SBS, that the victim was subjected to child abuse, and that the victim died as a result of "injuries" sustained from the May 3, 1999 event.  Additionally, Dr. Levy attested that he would no longer testify with any reasonable degree of medical certainty that the child had a healed clavicle fracture. He, "more likely than not," now attributed the victim's death to "a natural disease process," rather than inflicted trauma, and would reclassify the cause of death as "[u]ndetermined" and the manner of death as "[n]atural."

The Attorney General filed a response to these motions opposing any remand to the post-conviction court for reopening of the post-conviction proceedings.  The Attorney General maintained that the Petitioners were "asking for the proverbial second bite at the apple."  The Attorney General noted that the post-conviction court's order had become final and that jurisdiction had attached in this court.  According to the Attorney General, there was no authority or caselaw under these circumstances that provided this court with the ability to remand the matter and order the post-conviction court to consider evidence that was not originally submitted before it.

This court denied the motions to stay proceedings, but it noted that the assigned panel could revisit the issue.  During the oral argument in this case, the Petitioners renewed their requests to stay the appellate proceedings in light of Dr. Levy's affidavit and remand the matter to the post-conviction court for consideration.

- 35 -

This case, along with these procedural anomalies, is now before us for our review.

## II.    ANALYSIS

We will discuss the following procedural issues in addition to a review of the substantive merits of the Petitioners' claims of actual innocence based upon new scientific evidence: (1) whether review of Mr. Maze's appeal is permissive or an appeal as of right; (2) whether Mrs. Maze's petition for post-conviction relief is time-barred; (3) whether the State improperly changed its position on appeal in violation of due process, judicial estoppel, and waiver; (4) whether the post-conviction court's ruling infringed upon prosecutorial discretion and violated the party-presentation principle; (5) whether the post-conviction court erred by denying Mrs. Maze relief without independent review of her actual innocence claim; and (6) whether this case should be remanded to the post-conviction court for its consideration of additional testimony from Dr. Levy.

### A.    Jurisdiction

The Petitioners come before this court in distinct yet closely related legal postures: Mr. Maze's action arose as a motion to reopen his post-conviction proceedings, while Mrs. Maze appeals the denial of her original post-conviction petition. Nevertheless, both claims turn on whether there is new scientific evidence establishing that the Petitioners are actually innocent of the offenses for which they were convicted. Before we can explore the merits of their respective claims, however, we must first determine the precise posture of these post-conviction proceedings and the procedural avenue through which the Petitioners are invoking this court's jurisdiction. These determinations will dictate the appropriate standard of appellate review, particularly in Mr. Maze's case.

### 1.    Mr. Maze's Motion to Reopen

Mr. Maze argues that the post-conviction court in this case "implicitly" granted his motion to reopen and then held a substantive hearing on the merits of his actual innocence claim. According to Mr. Maze, because the post-conviction court denied his substantive claim, his appeal is governed by Tennessee Rule of Appellate Procedure 3(b) as a matter of right, which calls for de novo review with no presumption of correctness. The Attorney General responds that the post-conviction court did not reopen the post-conviction petition, averring that the motion to reopen remained pending at the time of the evidentiary hearing and that the post-conviction court ultimately determined that the proof did not support reopening Mr. Maze's post-conviction petition. Thus, according to the Attorney General, this court's review is permissive pursuant to Tennessee Code Annotated section 40-30-

- 36 -

117(c) and Tennessee Supreme Court Rule 28, section 10(B), which would result in an abuse of discretion standard of review. Both parties rely on various statements of the post-conviction court as set forth in its April 25, 2024 order, as well as certain entries in the minutes of the post-conviction court, to support their conflicting positions.

First, we recognize that this court initially issued an order on May 14, 2024, designating Mr. Maze's case as a Code section 40-30-117(c) appeal and ordering Mr. Maze to file an application for permission to appeal, rather than a Rule 3 notice of appeal. Mr. Maze then complied with this court's directive and filed an application for permission to appeal, wherein he also challenged this court's designation. Thereafter, this court issued another order on July 9, 2024, seemingly retreating from its prior determination by ordering that briefing would commence and that Mr. Maze and the Attorney General should address therein the appropriate procedure governing Mr. Maze's appeal and the corresponding standard of appellate review. Importantly, the appellate record was not filed until after the completion of both these orders. With the appellate record now filed, and oral argument and briefing completed, we are fully able to address this issue.

The Post-Conviction Procedure Act "contemplates the filing of only one (1) petition for post-conviction relief[,]" which Mr. Maze filed on August 23, 2007, and relief was subsequently denied by the original post-conviction court. Tenn. Code Ann. § 40-30-102(c). His direct appeal of that decision was likewise unsuccessful. *See generally Maze*, 2010 WL 4324377. Nonetheless, there are limited statutory circumstances whereby a petitioner may allege later arising claims via a motion "to reopen the first post-conviction petition[.]" Tenn. Code Ann. § 40-30-117(a). As relevant here, a motion to reopen post-conviction proceedings is cognizable only if "[t]he claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the . . . offenses for which the petitioner was convicted." *Id.* § -117(a)(2); *see also Keen v. State*, 398 S.W.3d 594, 607 (Tenn. 2012). The motion must assert facts underlying the claim which, "if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced." Tenn. Code Ann. § 40-30-117(a)(4). Additionally, the motion must be supported by an affidavit. *Id.* § -117(b). The post-conviction court shall deny the motion to reopen "unless the factual allegations, if true, meet the requirements of subsection (a)." *Id.*

When a post-conviction court denies a motion to reopen a post-conviction petition, the petitioner is not afforded an appeal as of right pursuant to Tennessee Appellate Procedure Rule 3(b). *See* Tenn. R. App. P. 3(b) (stating that, in post-conviction proceedings, a petitioner is only entitled to an appeal as of right "from a final judgment"). Rather, such denial may be challenged on appeal only by the filing of an application for permission to appeal in this court no later than thirty days after the denial by the post-

conviction court. Tenn. Code Ann. § 40-30-117(c); Tenn. Sup. Ct. R. 28, § 10(B). This court shall not grant the application unless it appears that the post-conviction court abused its discretion by denying the motion. Tenn. Code Ann. § 40-30-117(c). In contrast, once a motion to reopen is granted, "the procedure, relief and appellate provisions" of the Post-Conviction Procedure Act apply. *Id.* § -117(b); *see also id.* § -116 (stating that the post-conviction court's final order is appealable "in the manner prescribed by the Tennessee Rules of Appellate Procedure"). If this occurs, then this court reviews the post-conviction court's order granting or denying relief after assessing the substantive merits of the post-conviction claim de novo. *Arnold v. State*, 143 S.W.3d 784, 786 (Tenn. 2004).

Code section 40-30-117, by its very language, contemplates a post-conviction court's preliminary review of a motion to reopen before reopening the post-conviction petition and proceeding to an evidentiary hearing on the merits of the claim. *See* Tenn. Code Ann. § 40-30-117(a)(4) (stating that a petitioner may *file* a motion to reopen when "it *appears* that the facts underlying the claim, *if true*" as plead, meet one of the statutory exceptions for relief, thereby implying that a subsequent determination of their actual truth is necessary), -117(b) (indicating that "[t]he factual information set out in the affidavit shall be limited to information which, *if offered at an evidentiary hearing*, would be admissible through the testimony of the affiant under the rules of evidence" (emphasis added)); *see also* Tenn. Sup. Ct. R. 28, App'x F (providing a form preliminary order for when a post-conviction court determines that a post-conviction petition or motion to reopen presents a cognizable claim, indicating that an evidentiary hearing would follow); *Abdur'Rahman v. State*, 648 S.W.3d 178, 195 (Tenn. Crim. App. 2020) (determining that the post-conviction court's preliminary order amounted to a grant of the petitioner's motion to reopen).

Most of the time a motion to reopen "contemplates a summary proceeding in which the trial court can readily determine whether or not one of the three very narrow grounds for reopening exists." *Harris v. State*, 102 S.W.3d 587, 592 (Tenn. 2003), *overruled on other grounds by Nunley v. State*, 552 S.W.3d 800, 828 (Tenn. 2018). Our supreme court has advised,

> Because [these three very narrow] grounds [for reopening] can and likely will be proven by documentary evidence alone, there will rarely be a factual dispute as to their existence. When a ground for reopening is proven, the only factual dispute will be whether or not the petitioner has established by clear and convincing evidence that he or she is entitled to have the conviction set aside or the sentence reduced. . . . Again, because of the nature of the

- 38 -

grounds for reopening, even this factual issue should be relatively uncomplicated.

*Id.* Ideally, to effectuate the granting of a motion to reopen, a post-conviction court should first assess whether the petitioner has complied with the procedural requirements. Then, the post-conviction court should enter a preliminary order finding that the petitioner has presented a cognizable claim for relief—in this instance, factual allegations that, if true, constitute clear and convincing proof of actual innocence—before proceeding to a hearing. *See* Tenn. Sup. Ct. R. 28, App'x F; *see also Abdur'Rahman*, 648 S.W.3d at 195 (noting that the remedy available to either party concerning a post-conviction court's preliminary determination on a motion to reopen is to seek an interlocutory appeal).

In the appellate record at hand, the post-conviction court is silent until the two-day evidentiary hearing took place in March 2024. There is no preliminary order, minute entry, or any other indication of a prior proceeding involving the post-conviction court apparent from the record. We agree with the Attorney General that it was not the holding of a hearing itself that necessarily transformed these proceedings into a substantive review of Mr. Maze's actual innocence claim. From our assessment of the record, however, we do not think the post-conviction court held a hearing while Mr. Maze's motion to reopen remained open and pending adjudication, as the Attorney General contends. Instead, the post-conviction court held an extensive evidentiary hearing over two days and heard testimony from multiple medical experts regarding the advancements in science and medicine on SBS and AHT. At the hearing, the parties presented proof of their allegations and argued at its conclusion for the post-conviction court to vacate the Petitioners' convictions and dismiss the charges against them. The post-conviction court then, on April 25, 2024, issued a lengthy order containing findings of fact and conclusions of law. In the order, the post-conviction court recounted the procedural history of the case, reviewed the evidence introduced at the hearing, cited caselaw on various issues, and ultimately "dismissed" Mr. Maze's "petition" *and* denied him post-conviction relief.

The post-conviction court also made statements in the April 25 order concerning the procedural posture of the case, which indicated that the post-conviction court had reopened Mr. Maze's post-conviction petition: (1) The post-conviction court "ha[d] already accepted the instant post-conviction claim for review"; and (2) Mr. Maze's "basis for re-opening his original post-conviction relief petition under a new scientific evidence claim [was] appropriately filed" and timely. Similarly, in the order dismissing Mrs. Maze's petition for post-conviction relief, the post-conviction court stated that it was denying both Petitioners' requests for post-conviction relief. These statements clearly demonstrate the overall intention of the post-conviction court to grant Mr. Maze's motion to reopen and address his substantive claim of actual innocence on the merits.

- 39 -

The post-conviction court's statement in its order regarding Mr. Maze's avenue of appeal pursuant to Code section 40-30-117(c), although inaccurate, does not sway us from this conclusion. First, we will not read this statement by the post-conviction court in isolation, particularly given the apparent intent of the post-conviction court to hear the matter on the merits, and the also notable procedural complexity and unique circumstances present here. Moreover, the post-conviction court, by this statement, does not have the authority to confer or divest this court of appellate jurisdiction. *See Depew v. King's, Inc.*, 276 S.W.2d 728, 729 (Tenn. 1955) ("[T]he right of appeal is wholly constitutional or statutory in origin[.]"). This is a matter we must determine independently. *See* Tenn. R. App. P. 13(b) (stating that this court is required to "consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review").

Furthermore, contrary to the Attorney General's assertion, the minute entries do not show that the post-conviction court treated the two cases differently—Mr. Maze's as a motion to reopen, and Mrs. Maze's as a petition for post-conviction relief. Instead, as Mr. Maze points out, in the minute entries, the post-conviction court was merely identifying the nature of the filings by the Petitioners before summarizing the court proceedings that followed. After the conclusion of the evidentiary hearing on March 27, 2024, the minute entries provided that, "[a]fter due consideration and all the evidence introduced," said "PCR [was] taken under advisement with an order to be entered." The minute entries support, rather than discredit, Mr. Maze's position that the post-conviction court was indeed adjudicating the merits of his actual innocence claim.

Seemingly, just as the State did in *Abdur'Rahman*, the Attorney General "does not contend that [Mr. Maze's] motion to reopen failed to comply with the pleading requirements of subsection (a); it simply disagrees with [his] claim on the merits." *See* 648 S.W.3d at 195. From our review of the procedure utilized, coupled with the totality of the statements by the post-conviction court in its April 25, 2024 order and the minute entries, we are constrained to agree with Mr. Maze that the post-conviction court implicitly[6] granted his motion to reopen his post-conviction petition and then proceeded to an evidentiary hearing followed by a determination on the merits of his substantive claim of actual innocence. *See id.* (noting that preliminary consideration amounted to a grant of the petitioner's motion to reopen when that order was followed by a hearing during which the parties presented both arguments and evidence on the ultimate issue). Accordingly, we conclude that Mr. Maze properly filed a Rule 3 notice of appeal, and this court will review his claim as a direct appeal as of right with application of a de novo standard of review.

---

[6] We do not mean to foreclose the possibility of an explicit determination regarding such that occurred in a proceeding absent from the record on appeal.

### 2.   Mrs. Maze's Petition and the Statute of Limitations

Initially, Mrs. Maze did not present any argument on appeal regarding tolling the statute of limitations of her post-conviction petition, presumably because the post-conviction court agreed that the Petitioners' actual innocence claims were timely. However, on appeal, the Attorney General argues that Mrs. Maze's petition for post-conviction relief, her first, was barred by the statute of limitations. Mrs. Maze responds that the post-conviction court properly allowed tolling of the statute of limitations and heard her actual innocence claim on the merits.

Generally, under Tennessee Code Annotated section 40-30-102(a), a post-conviction petition must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a). No one disputes that Mrs. Maze's petition was filed long after the one-year statute of limitations had expired. However, there are three narrow statutory exceptions under which an untimely petition may be considered on the merits. *Id.* § -102(b). And, those statutory grounds for tolling the limitations period are coextensive with those for granting a motion to reopen. *Compare* § -102(b) *with* § -117(a). As relevant here, "[n]o court shall have jurisdiction to consider a petition filed after the expiration of the limitations period unless . . . [t]he claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted[.]" *Id.* § -102(b)(2).

Furthermore, Code section -106 provides that "[i]f it plainly appears from the face of the petition, any annexed exhibits or the prior proceedings in the case that the petition was not filed . . . within the time set forth in the statute of limitations, . . . the judge shall enter an order dismissing the petition." *Id.* § -106(b).

> The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings. Failure to state a factual basis for the grounds alleged shall result in immediate dismissal of the petition.

*Id.* § -106(d); *see also* Tenn. Sup. Ct. R. 28, § 5(E) (setting forth the required contents of a post-conviction petition, including "specific facts supporting each claim for relief asserted by petitioner"), (F) (providing grounds for summary dismissal of a post-conviction petition, including untimeliness, for failure to include specific factual allegations and for

failure to include reasons why the claim is not barred by the statute of limitations). "[T]he petitioner bears the burden of pleading and proving that the statute of limitations should be tolled." *Anderson v. State*, 692 S.W.3d 94, 104 (Tenn. Crim. App. 2023) (citing Tenn. Sup. Ct. R. 28, § 5(F)(4)). The question of whether the post-conviction statute of limitations should be tolled is a mixed question of law and fact and is subject to de novo review. *Bush v. State*, 428 S.W.3d 1, 16 (Tenn. 2014) (citing *Smith v. State*, 357 S.W.3d 322, 355 (Tenn. 2011)).

Similarly to a motion to reopen, a trial court's preliminary consideration of whether the limitations period should be tolled is contemplated by statute to occur prior to proceeding to an evidentiary hearing on the merits of an actual innocence claim. *See* Tenn. Code Ann. §§ 40-30-102(b), -106(b); *Saulsberry v. State*, No. W2002-02538-CCA-R3-PC, 2004 WL 239767, at *1 (Tenn. Crim. App. Feb. 9, 2004) ("Given the post-conviction statute's language conferring jurisdictional import to the timely filing of a petition, it is essential that the question of timeliness be resolved before any adjudication on the merits of the petitioner's claims may properly occur." (citing Tenn. Code Ann. § 40-30-102(b)); *Seals v. State*, No. 03C01-9802-CC-00050, 1999 WL 2833, at *3-4 (Tenn. Crim. App. Jan. 6, 1999) (determining that the petitioner's allegations, as a matter of preliminary consideration, were sufficient to save his petition from summary dismissal based upon untimeliness), *aff'd*, 23 S.W.3d 272 (Tenn. 2000). In fact, Code section -106, which encompasses the one-year statute of limitations, is titled, "Preliminary Consideration." This court has previously observed, "When a court receives a post-conviction petition, it must conduct a preliminary review to determine, among other matters, whether the petition is timely and whether it states a colorable claim." *Carter v. State*, No. W2018-00285-CCA-R3-PC, 2018 WL 6266166, at *2 (Tenn. Crim. App. Nov. 30, 2018) (citing Tenn. Code Ann. § 40-30-106(b), (d)).

For the same reasons expressed above regarding Mr. Maze, we conclude that the post-conviction court, at the preliminary consideration phase, tolled the statutory limitations period for Mrs. Maze's petition and heard her claim of actual innocence on the merits. Once again, the Attorney General seemingly "does not contend that [Mrs. Maze's] petition failed to comply with the pleading requirements for statutory tolling; it simply disagrees with [her] actual innocence claim on the merits." *See Abdur'Rahman*, 648 S.W.3d at 195. Upon our de novo review, we conclude that, as a preliminary matter, Mrs. Maze met her burden of presenting sufficient factual allegations in support of her statutory tolling claim "based upon new scientific evidence" establishing her actual innocence. *See* Tenn. Code Ann. § 40-30-106(b), (d); -117(a)(2); Tenn. Sup. Ct. R. 28, § 5(E), (F). The post-conviction court did not err by proceeding to a merits hearing on her petition. *See Bush*, 428 S.W.3d at 16. Thus, we will review the post-conviction court's order as a Rule 3 appeal of the denial of Mrs. Maze's petition on the merits of her actual innocence claim.

## B. Additional Procedural Issues

The parties have raised several additional procedural issues that must be addressed before we can turn to our review of the substantive merits of the Petitioners' actual innocence claims. These issues again arise from the current posture of this case—the District Attorney's taking the position below to join in the Petitioners' request for post-conviction relief, and the Attorney General's taking the contrary position on appeal arguing that this court should affirm the denial of post-conviction relief. The Petitioners argue that the State cannot oppose the stance it took in the post-conviction court, and they further contend that the post-conviction court impeded upon prosecutorial discretion and violated the party-presentation rule by failing to properly "credit the State's fact admissions."

### 1. Relevant Law

Both the Attorney General and District Attorney are constitutional officers established by article VI, section 5 of the Tennessee Constitution, and the legislature has codified their respective duties and responsibilities. The legislature has given the District Attorney the power to prosecute criminal cases at the trial level, whereas the Attorney General has been given exclusive authority over criminal cases at the appellate level. *See* Tenn. Code Ann. §§ 8-6-109(b)(2), -7-103(1); *see also State v. Simmons*, 610 S.W.2d 141, 142 (Tenn. Crim. App. 1980). The same division of authority applies in post-conviction proceedings. *Abdur'Rahman*, 648 S.W.3d at 191. Under the Post-Conviction Procedure Act, the District Attorney "shall represent the [S]tate" in responding to the petition and asserting "the affirmative defenses the [District Attorney] deems appropriate." Tenn. Code Ann. § 40-30-108(a), (d). Additionally, the District Attorney "has the option to assert" certain defenses by filing a motion to dismiss. *Id.* § -108(c). Also, "[w]hen [the District Attorney] knows of clear and convincing evidence establishing that a defendant was convicted in the [District Attorney's] jurisdiction of an offense that the defendant did not commit, the [District Attorney] shall seek to remedy the conviction." Tenn. Sup. Ct. R. 8, RPC 3.8(h). During proceedings in the post-conviction court, the Attorney General shall "lend whatever assistance may be necessary to the [District Attorney] in the trial and disposition of the cases." Tenn. Code Ann. § 40-30-114(b)(1). However, "[i]n the event an appeal is taken[,]" the Attorney General "shall represent the [S]tate and prepare and file all necessary briefs in the same manner as now performed in connection with criminal appeals." *Id.* § -114(b)(2).

Prior to 1967, persons convicted in Tennessee largely utilized federal habeas corpus petitions to challenge criminal convictions. *See Case v. Nebraska*, 381 U.S. 336, 338

- 43 -

(1965) (per curiam) (Clark, J., concurring); *see also* 1967 Tenn. Pub. Acts 801, ch. 310. "The sheer volume of federal habeas corpus petitions filed by state inmates, as well as principles of comity, eventually led the United States Supreme Court to suggest that states enact statutory post-conviction procedures," allowing criminal defendants "an avenue to litigate alleged constitutional errors in state courts, at least in the first instance." *Baker v. State*, 417 S.W.3d 428, 433 (Tenn. 2013) (citing *Case*, 381 U.S. at 339-40). In response, the Tennessee General Assembly enacted the Post-Conviction Procedure Act. *Id.* at 434 (citing 1967 Tenn. Pub. Acts 801, ch. 310). "From its inception, the purpose of the [Post-Conviction Procedure] Act has been to provide a procedural avenue for litigating in Tennessee courts alleged constitutional errors in Tennessee criminal convictions." *Id.*

"A post-conviction case is not a criminal prosecution, but [it] is a means to address a petitioner's allegations of constitutional wrongdoing in a previous convicting or sentencing process." *Bryan v. State*, 848 S.W.2d 72, 81 (Tenn. Crim. App. 1992). It is not the State in a collateral review proceeding, but the convicted defendant "who commences, institutes, or brings the legal proceeding to challenge the validity of an otherwise final conviction." *McKay v. State*, No. W2023-01207-CCA-R9-CO, 2024 WL 4404318, at *7 (Tenn. Crim. App. Oct. 4, 2024) (citations omitted), *vacated in part on other grounds by McKay v. State*, 706 S.W.3d 338 (Tenn. 2025). Accordingly, the State is typically placed in the position of defense in collateral proceedings such as this one. *Id.* (citations omitted).

However, "[t]his is not to say that the representative of the State is obligated to defend the conviction at all costs; rather, the ethical duty remains to seek justice." *Id.* at n.8 (first citing *State v. Culbreath*, 30 S.W.3d 309, 314 (Tenn. 2000); and then citing *State v. Superior Oil, Inc.*, 875 S.W.2d 658, 661 (Tenn. 1994)). "We will not presume that one representative of the State is more likely to uphold this ethical duty than another[,]" although this concept does not prohibit reasonable minds from disagreeing. *Id.* (citing *State ex rel. Com'r of Transp. v. Med. Bird Black Bear White Eagle*, 63 S.W.3d 734, 775 (Tenn. Ct. App. 2001) ("noting that 'the courts must always presume that public officials, including the Attorney General, will discharge their duties in good faith and in accordance with the law'")).

"*Prior to indictment*, the [D]istrict [A]ttorney 'has virtually unbridled discretion in determining whether to prosecute and for what offense.'" *State v. Mangrum*, 403 S.W.3d 152, 163 (Tenn. 2013) (quoting *Dearborne v. State*, 575 S.W.2d 259, 262 (Tenn. 1978)) (emphasis added). However,

> [T]he scope of prosecutorial discretion changes as a criminal case proceeds, narrowing as the case nears completion. At the outset, a prosecutor has almost unfettered power to charge, or not charge, as he or she sees fit. Once

charges are filed, the prosecutor may withdraw them by nolle prosequi, subject to judicial oversight.  A prosecutor may also choose to enter into a plea agreement, again subject to appropriate judicial oversight. . . .

After trial and the entry of a . . . verdict, however, a district attorney's prosecutorial discretion narrows significantly. . . .   A representative cross section of the community has issued its decision, and the prosecutor . . . may not thereafter unilaterally alter that decision.  The community now has an interest in the verdict, which may thereafter be disrupted only if a court finds legal error.

*McKay*, 2024 WL 4404318, at *9-10 (quoting *Commonwealth v. Brown*, 196 A.3d 130, 146 (Pa. 2018)).

Thus, "[a]ny discretion the [D]istrict [A]ttorney may have in the context of collateral review proceedings is curtailed due to the finality of the conviction." *Id.* at *10.  For instance, "[c]ertain defenses, such as the statute of limitations or the prior determination of issues, cannot be waived." *Id.* (first citing *Nunley*, 552 S.W.3d at 828; then citing *Anderson*, 692 S.W.3d at 104; and then citing *Black v. State*, No. M2022-00423-CCA-R3-PD, 2023 WL 3843397, at *9-10 (Tenn. Crim. App. June 6, 2023)).  In addition, "[a]ny agreements made to forego a collateral review proceeding must pass stricter judicial scrutiny than a plea agreement [entered into] under Tennessee Rule of Criminal Procedure Rule 11 because the trial court's jurisdiction is limited by statute to granting only certain forms of relief under specific circumstances." *Id.* (citing *Abdur'Rahman*, 648 S.W.3d at 197 ("holding that under the Post-Conviction Procedure Act, '[o]nly upon a finding that either the conviction or sentence is constitutionally infirm can the post-conviction court vacate the judgment and place the parties back into their original positions, whereupon they may negotiate an agreement to settle the case without a new trial or sentencing hearing'") (internal citation omitted)).  Similarly, "[w]hile a district attorney has sole discretion to file or withdraw a notice of intent to seek the death penalty prior to conviction, . . . he cannot bypass the statutory requirements of a collateral review proceeding by entering an agreement to amend a final judgment from death to life imprisonment." *Id.* (first citing *Abdur'Rahman*, 648 S.W.3d at 198; then citing *State v. Avila-Salazar*, No. M2019-01143-CCA-R3-PC, 2020 WL 241605, at *2 n.1 (Tenn. Crim. App. Jan. 15, 2020) ("noting that '[n]othing in the record explains how the State would nolle prosequi a final judgment of conviction' offered to settle a pending post-conviction petition"); and then citing *Bennett v. State*, 10 Tenn. (2 Yer.) 472, 475 (Tenn. 1830) ("holding that the attorney for the State could not enter an extrajudicial agreement regarding the payment of fines because he 'had no power over the final judgment' in a criminal case")).

## 2. Changing Theories on Appeal

The Petitioners contend that allowing the Attorney General to change theories on appeal by departing from the concessions of the District Attorney in the post-conviction court violates principles of due process, judicial estoppel, and waiver. The Petitioners observe that, although there is an exception to this tenet for challenging jurisdictional issues on appeal, such exception is not applicable here because jurisdiction has been established. Mrs. Maze notes that the District Attorney called and questioned four of the seven experts at the evidentiary hearing, but the State is now, through the Attorney General, arguing that the post-conviction court "appropriately discounted the testimony" of the State's own witnesses. In Mr. Maze's words, "the State has changed its position on _facts_ that it admitted in the court below." According to the Petitioners, precedent dictates that this court should "refuse to accept" the State's position change.

Generally speaking, it is true that "[t]he same rules that apply to defendants likewise apply to the State" with regard to the waiver of issues raised for the first time on appeal, even when the Attorney General "on appeal apparently disagrees with the [District Attorney's] concession in the trial court[.]" *Abdur'Rahman*, 648 S.W.3d at 192 (first quoting *State v. Smith*, No. M2014-01130-CCA-R3-CD, 2015 WL 4656553, at *7 (Tenn. Crim. App. Aug. 6, 2015); then citing *State v. Watkins*, 804 S.W.2d 884, 886 (Tenn. 1991) ("noting that, 'proverbially speaking, what is applicable to the goose ought to be applied to the gander' with regard to waiver"); and then citing *State v. Adkisson*, 899 S.W.2d 626, 635-36 (Tenn. Crim. App. 1994) ("It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this [c]ourt.")). Despite this, it also "is not uncommon" for the Attorney General to take a different position on appeal from the one held by the District Attorney in the lower court, "even when such position is contrary to an agreement between the District Attorney [] and the defendant." *Id.* (collecting cases).

The Petitioners rely on this court's opinion in *Abdur'Rahman* for the proposition that the Attorney General is bound by the facts and the "merits arguments" made by the District Attorney in the post-conviction court. *See generally id.* In *Abdur'Rahman,* the Attorney General appealed an agreed order entered between the petitioner and the district attorney, arguing that the post-conviction court lacked jurisdiction to accept the agreed order and amend the petitioner's sentence. *Id.* at 183. The petitioner responded that this court lacked jurisdiction to hear the appeal because the State consented to the agreed order in the post-conviction court, thereby foreclosing any right of the State to appeal. *Id.* This court agreed with the Attorney General that it had a right to challenge the jurisdiction of the post-conviction court regardless of any agreement below, emphasizing that jurisdictional defects may never be waived by consent. *Id.* at 193.

Similarly, in *Simmons*, the Attorney General filed a motion to dismiss the State's appeal as to certain defendants, but the district attorney filed a motion objecting to the dismissal insisting that it had the right to pursue the appeal notwithstanding the position of the Attorney General. 610 S.W.2d at 141. This court, citing to the statutes governing the duties of the various district attorneys and setting forth the duties of the Attorney General, affirmed that the Attorney General had the exclusive authority to pursue remedies in appellate courts, even if such pursuit differed from a district attorney's position in the trial court. *Id.* at 142. Accordingly, this court sustained the Attorney General's motion to dismiss.

The Petitioners correctly note that jurisdiction has been established in this matter—*i.e.*, the post-conviction court had both the authority to grant the motion to reopen and to toll the statute of limitations before hearing the Petitioners' claims of actual innocence. However, contrary to Mr. Maze's assertion, the Attorney General is in fact presenting argument on appeal concerning the dispositive legal question, that being whether Mr. Maze's actual innocence has been established from the proof. This is not merely the changing of an evidentiary theory or the failure to object to an error during the heat of trial; instead, there is no real change to the facts as being argued by the Attorney General on appeal but rather the application of those facts to the ultimate legal issue at hand.

"[T]he legislature may enact statutes and rules requiring judicial scrutiny of a district attorney's discretionary decision to dispose of a charge other than through a trial verdict." *McKay*, 2024 WL 4404318, at *9. In the post-conviction context, "the trial court's jurisdiction is limited by statute to granting only certain forms of relief under specific circumstances." *Id.* at *10 (citing *Abdur'Rahman*, 648 S.W.3d at 197 (holding that under the Post-Conviction Procedure Act, "[o]nly upon a finding that either the conviction or sentence is constitutionally infirm can the post-conviction court vacate the judgment and place the parties back into their original positions, whereupon they may negotiate an agreement to settle the case without a new trial or sentencing hearing") (internal citation omitted)); *see also State v. Payne*, --- S.W.3d ---, 2025 WL 1682152, at *6 n.7 (Tenn. June 16, 2025) (noting that, for post-conviction purposes, "a court may exercise jurisdiction over a final judgment only when it has been given the authority to do so") (citing *Edwards v. State*, 269 S.W.3d 915, 920-21 (Tenn. 2008))). Again, reasonable minds may differ on the ultimate issue of the Petitioners' actual innocence, and the Attorney General has been given the statutory authority to pursue the appropriate remedy on appeal, including challenging agreements or settlements that exceed a trial court's jurisdiction or fail to comply with statutory requirements for post-conviction relief.

Also, as noted, this is a collateral proceeding established by the legislature, and prosecutorial discretion has lessened significantly by this point in the life cycle of a case. For instance, the District Attorney cannot simply agree to vacate the Petitioners' convictions, as any agreed-upon decision in this regard must first be reviewed—and approved—by the post-conviction court. While the *Abdur'Rahman* court noted that it was dealing with a jurisdictional issue, which could never be ignored, it did not specifically hold that its rationale was inapplicable outside the jurisdictional context. As in *Abdur'Rahman*, the issue presented here goes to the very heart of a post-conviction court's authority to adjudicate a matter and set aside a criminal conviction, although not in a traditional jurisdictional context. If the Attorney General may appeal an agreement between a petitioner and a prosecutor that was accepted by the post-conviction court, then it certainly follows that the Attorney General may also argue for this court to affirm the post-conviction court's determination refusing to accept a similar agreement. *See, e.g.*, *Nichols v. State*, No. E2018-00626-CCA-R3-PD, 2019 WL 5079357, at *11 (Tenn. Crim. App. Mar. 26, 2019) (although not specifically raised as an issue, agreeing with the State's changed position on appeal). This conclusion underscores the importance of the Attorney General's independent role in ensuring that post-conviction proceedings adhere to legal standards and statutory mandates. Finally, as a matter of observation, we note that this court is tasked with applying the law to the facts under a de novo standard independently of the Attorney General's appellate argument, a matter we discuss in more detail in the following section.

### 3. Prosecutorial Discretion and the Party-Presentation Rule

The Petitioners also argue that the post-conviction court failed "to credit the [District Attorney's] fact admissions[,]" instead making "contrary findings [of] fact [on] issues that the [District Attorney's] judicial admissions foreclosed[.]" According to the Petitioners, the post-conviction court improperly "discounted the weight of the new evidence because the experts were not subject to cross-examination, violating the party presentation principle and infringing upon prosecutorial discretion." Mrs. Maze asserts that the post-conviction court should have given the District Attorney's concession of error "great weight." The Legal Scholars contend as Amicus Curiae that the post-conviction court's decision "undermines the purpose of conviction integrity units by giving short shrift to the prosecutor's duty of candor and responsibility to do justice."

At the conclusion of the post-conviction hearing, counsel for Mrs. Maze averred that the post-conviction court's "task [was] fairly easy[,]" prompting the post-conviction court to ask, "So why did we have this hearing?" Counsel also said that the post-conviction court was bound by the parties' factual admissions but that, "obviously," application of the "the law [was] up" to the post-conviction court. In its order denying relief, the

- 48 -

post-conviction court observed that the experts were not cross-examined at the hearing and that their opinions stated therein "were packaged as the wholesale truth." The post-conviction court "diminishe[d] the value of the newly presented evidence where fresh opinions were offered but not probed." The post-conviction court further noted that counsel at the hearing had insinuated the court was limited in its role as fact-finder given the District Attorney's concession. However, the post-conviction court responded by maintaining that it "retain[ed] the equally important roles of determining credibility of the witnesses along with weighing and valuing the proof presented." The post-conviction court concluded, "Courts should undoubtedly be the champion of justice and be willing to correct a wrongdoing wherever it may exist. However, in doing so, a court's main purpose and ultimate goal must be upholding the rule of law both constitutionally and statutorily." We believe this to be an accurate expression of the post-conviction court's, as well as this court's, statutorily mandated responsibility to independently analyze the evidence presented and make a neutral determination of whether the Petitioners had clearly and convincingly established their actual innocence.

The Post-Conviction Procedure Act requires the post-conviction court to "state the findings of fact and conclusions of law with regard to each ground" in its final order disposing of the post-conviction petition, regardless of whether it is granting or denying relief. Tenn. Code Ann. § 40-30-111(b); *see also* Tenn. Sup. Ct. R. 28, § 9(A); *State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984) (noting that this is a mandatory requirement designed to facilitate appellate review of the post-conviction proceedings). Post-conviction relief is only warranted "[*i*]*f* the court finds that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable[.]" Tenn. Code Ann. § 40-30-111(a) (emphasis added). Indeed, the post-conviction court was tasked with following the statutory requirements of the Post-Conviction Procedure Act and independently analyzing the facts and issues "to determine whether the concession reflected an accurate statement of the law." *Nichols*, 2019 WL 5079357, at *12 (first citing *Barron v. State Dep't of Human Servs.*, 184 S.W.3d 219, 223 (Tenn. 2006); and then citing *State v. Shepherd*, 902 S.W.2d 895, 906 (Tenn. 1995) ("independently analyzing the defendant's death sentence after finding 'no legal basis in this record for outright modification of the sentence to life [imprisonment],' despite the State's concession at oral argument")).

Again, article VI, section 5 of the Tennessee constitution protects "the exercise of the prosecutorial discretion traditionally vested in the [district attorney] in determining whether, when, and against whom to *institute* criminal proceedings[,]" *Superior Oil, Inc.*, 875 S.W.2d at 660 (emphasis added), but the prosecutor's discretion narrows significantly as the case reaches its final conclusion. The prosecutor's discretion at this point is limited to attempts, through the exercise of effective advocacy, to persuade the courts to agree that

error occurred as a matter of law. To accept any argument otherwise would reduce the post-conviction court to nothing more than a "rubber stamp" for the agreement reached between the District Attorney and the Petitioners in this collateral proceeding. More importantly, enforcement of the agreement as suggested by the Petitioners would reverse a jury's verdict without any judicial review. "Only upon a finding that either the conviction or sentence is constitutionally infirm can the post-conviction court vacate the judgment and place the parties back into their original positions, whereupon they may negotiate an agreement to settle the case without a new trial or sentencing hearing." *Nichols*, 2019 WL 5079357, at \*11 (citing *State v. Boyd*, 51 S.W.3d 206, 211-12 (Tenn. Crim. App. 2000)). As discussed above, "courts must consider not only the maximizing of protection to convicted defendants but the avoidance of impossible burdens on prosecutors and the need to preserve the finality of convictions rendered after trials as nearly faultless as human frailties will permit." *United States v. Keogh*, 391 F.2d 138, 146 (2nd Cir. 1968).

In their various arguments, the Petitioners heavily emphasize the post-conviction court's statements regarding the lack of cross-examination of the expert witnesses at the evidentiary hearing. From our review of these comments, we think the post-conviction court was simply noting it lacked the benefit of the value of cross-examination in performing its statutory fact-finding responsibility, given that cross-examination has been regarded as "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting Wigmore, *Evidence in Trials at Common Law* § 1367 (1904)). It was not punishing the Petitioners, as they contend, by "discounting the hearing evidence" because of the District Attorney's decision to concede the facts and forego cross-examination, but instead, was noting the limitations imposed upon it by this decision. Surely, in this case, the post-conviction court would have been aided in complying with its statutory mandate of independent assessment of the facts in relation to the law by hearing testimony about the various experts' methodologies, their findings and recommendations, and to have this testimony tested by the "crucible of vigorous cross-examination." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). For these reasons, we cannot say that the post-conviction court erred in refusing to accept the District Attorney's concession regarding the facts or purported legal error on the Petitioners' post-conviction claims. *See Nichols*, 2019 WL 5079357, at \*12 (holding that the post-conviction court did not abuse its discretion in refusing to accept the district attorney's concession of error on the petitioner's post-conviction claims, but it, instead, acted well within its authority by independently analyzing the issues to determine whether the concession reflected an accurate statement of the law (first citing *State v. Hester*, 324 S.W.3d 1, 69 (Tenn. 2010); and then citing *Barron*, 184 S.W.3d at 223)).

C.      Substantive Merits of Actual Innocence Claims

1.      Standard of Review

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A free-standing claim of actual innocence may be brought under the Tennessee Post-Conviction Procedure Act, but those claims are limited to allegations supported by newly discovered scientific evidence. *Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009) (citing Tenn. Code Ann. §§ 40-30-102(b)(2), -117(a)(2)). The Petitioners must show that new scientific evidence clearly and convincingly establishes that they are actually innocent of the underlying offenses. Tenn. Code Ann. § 40-30-110(f) ("The petitioner shall have the burden of proving the allegations of fact by clear and convincing evidence."); *see also Dellinger*, 279 S.W.3d at 293-94. In defining "actual innocence" in the post-conviction context, our supreme court has said plainly that "'actually innocent of the offense' means nothing other than that the person did not commit the crime." *Keen*, 398 S.W.3d at 612.

> To meet the clear and convincing standard, the trial court must determine that the evidence offered . . . is not vague and uncertain. The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*Clardy v. State*, 691 S.W.3d 390, 408 (Tenn. 2024) (citing *State v. Jones*, 450 S.W.3d 866, 893 (Tenn. 2014)). Stated another way, the new scientific evidence of actual innocence should leave the court with no serious or substantial doubt that the petitioner did not commit the offense. *Id.*

Furthermore, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Id.* Because a claim of actual innocence is a mixed question of law and fact, we review the issue de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006) ("The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of

correctness."), *abrogated on other grounds by Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018).

## 2.    Analysis

Both Petitioners submit that the "uncontested new scientific evidence" clearly and convincingly establishes their actual innocence.  The Petitioners again spend much of their time focusing on the methodology the post-conviction court utilized in reaching its ultimate determination.  As for substance, Mr. Maze notes that it is "now undisputed that the [victim's internal] bleeding was <u>not</u> caused by abuse[,]" and he asserts that the post-conviction court "ignore[d] the two decades of new medical research and data on" SBS and AHT "in favor of the roughly [twenty]-year-old evidence presented in an earlier criminal trial[.]"  As for his production of new scientific evidence, Mr. Maze states, "None of the experts who testified at [his] trial in 2004 had the benefit of the twenty years of scientific development that informed the testimony of the seven physicians who testified at [his 2024] hearing, all of whom agreed that objective medical evidence today proves [his] innocence."  In the words of Mrs. Maze, "[as] all seven experts explained in their testimony [at the hearing], new scientific knowledge that is supported by the consensus of the modern medical community exonerates [the Petitioners], while old scientific evidence *is no longer sound*."

The Attorney General asserts that the Petitioners failed to provide new scientific evidence of Mr. Maze's actual innocence, but instead, merely provided cumulative evidence comprised of "different perspectives" on "[o]ld data[.]"  The Amicus Curiae Trial Prosecutors also have much to add about the veracity of the new scientific evidence, arguing vigorously that "[t]he State and their medical experts did not 'get it wrong' in 2004[.]"

Certainly, for post-conviction purposes, advancements in medicine may constitute new scientific evidence of actual innocence under the right circumstances.  *See Maze*, 564 F. App'x at 180.  However, a claim of actual innocence is not satisfied by evidence that is vague, speculative, or cumulative.  *See Wlodarz v. State*, 361 S.W.3d 490, 499 (Tenn. 2012) (stating that a petitioner cannot premise relief for actual innocence on evidence "which is merely cumulative or 'serves no other purpose than to contradict or impeach'" (quoting *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995))), *abrogated on other grounds by Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016); *see also Larsen v. Soto*, 742 F.3d 1083, 1096 (9th Cir. 2013).  Further, if the evidence relied upon is not truly "new" but, instead, was in substance already before the jury, it is unlikely to weigh heavily in favor of a finding of actual innocence.  *See Barnes v. State*, No. M2017-02033-CCA-R3-ECN, 2018 WL 3154346, at *7 (Tenn. Crim. App. June 26, 2018) (observing, in the context of tolling

an error coram nobis claim of actual innocence, that the petitioner already "had the opportunity to present this theory at trial and again at his post-conviction hearing").

Here, the Petitioners only vaguely allude to why their experts' opinions should be classified as "new" scientific evidence due to the medical community's expanded knowledge of AHT and SBS and its potential mimickers. As we see it, the expert testimony offered at the evidentiary hearing was largely speculative, given that many of the Petitioners' experts disagreed upon the actual cause of the victim's death, if they came to a conclusion at all, and several were unwilling to definitively rule out a diagnosis of child abuse. Finally, these recently-acquired expert opinions are cumulative as they merely add to the lengthy history of medical opinions that have been elicited throughout the pendency of this case—both at Mr. Maze's trial and through his subsequent litigation in state and federal courts. For these reasons, as discussed in more detail below, we conclude that the Petitioners have failed to establish that their scientific evidence is truly "new" or that this evidence provides clear and convincing proof that Mr. Maze is actually innocent of these offenses, *i.e.*, that he did not commit aggravated child abuse which caused the victim's death.

a.      "New" Scientific Evidence

i.      Advancements in Medicine

The Petitioners' arguments regarding recent advancements in medicine are vague and lack any specificity as to the particular advancements over the last two decades that would have impacted the result in the victim's case in 2004. As for what made Dr. Mileusnic-Polchan's opinion "new" scientific evidence, she first indicated that, although retinal hemorrhaging was initially associated only with trauma, articles regarding new etiologies began being published in the 1990s and 2000s. When the post-conviction court subsequently noted that Mr. Maze's trial took place in 2004, Dr. Mileusnic-Polchan clarified that these articles had become "more prominent in the 2000s, and especially by 2010 and in the last, kind of couple decades[.]" As for what made Dr. Scheller's opinion "new," he said that the medical community had learned an incredible amount in cases such as the victim's over the last fifteen to twenty years, that MRI tests were likewise far superior in the present day, and that there was now widespread use of ultrasound imaging.

In this regard of newness, Dr. Laposata noted the progression of medical literature on the naturally occurring mimickers of child abuse, including the role of bleeding disorders. He indicated that his first study on the topic was published in 2005, after he became interested in learning about the mimickers, when it was "realized that of [twenty] children who looked beaten, [nineteen] of them were[,]" but there was that one child who

was wrongly diagnosed. Dr. Hunsaker noted that recent medical studies concluded that each of the "triad of symptoms" for SBS could stem from certain natural causes and conditions. He indicated that, while much of this information had been collected over the last ten years, "[t]he process ha[d] been going on longer[.]"

Dr. Hutchins testified that the list of child abuse mimickers had expanded greatly since the time of Mr. Maze's trial. As for how his opinion was based on "new" scientific evidence, Dr. Hutchins was asked, "Can you tell us some of the other causes that would have been known around the time that [the victim] presented in 1999/2000?" In response, he referenced a "rather limited" journal article published in 2000 that discussed bleeding abnormalities, motor vehicle accidents, and tumors, as causes in infants who presented with subdural hematomas but lacked external evidence of abuse. He then noted that in an article from nine years later, the list was far more expansive.

Importantly, several of the Petitioners' experts indicated that they would have reached similar conclusions at the time of Mr. Maze's 2004 trial as the ones they proffered at the instant hearing, again signifying that this evidence is not "new." Dr. Scheller affirmed that he probably would have made these same conclusions at the time of trial. When Dr. Sandler-Wilson was asked if she would have diagnosed the victim with SBS in 1999, she said, "Not on the available evidence that I had at the time." Many of their opinions focused on the lack of investigation that was done *at the time* of the victim's injuries and subsequent death. In fact, Dr. Mileusnic-Polchan insinuated that Dr. Levy came to the wrong conclusion in 2000 due to his busy schedule, rather than because new developments in medicine had emerged.

Despite the Petitioner's experts focusing on the expansion of the list of mimickers and that further testing should have been done to exclude these in the victim's case, nothing in this expanded list necessarily excluded AHT or SBS as the cause of the victim's injuries in this case. Moreover, at Mr. Maze's trial, Dr. Starling did not testify that SBS was the only cause for the triad of symptoms present in the victim upon his presentation on May 3, 1999. Instead, evidence was presented to the jury that the treating physicians tested the victim for other conditions or disorders that could have led to his symptoms, but those tests were negative. And while advancements have been made in MRIs and CT scans, and there is now widespread use of ultrasound imaging, simply because medicine has evolved over the last twenty years does not necessarily correlate into "new" scientific evidence of actual innocence.

ii.     Previously Presented

Finally, as the post-conviction court aptly recognized, the "new" expert opinions presented in these proceedings, although allegedly based upon expanded medical knowledge, are nonetheless aspects of the very same claim Mr. Maze has already litigated at trial and through subsequent litigation.  As such, these opinions can only be classified as cumulative, rather than "new."

At Mr. Maze's 2004 trial, he "fiercely contested the charges . . . , and both he and the [S]tate introduced prodigious expert medical evidence to support their respective positions." *Maze*, 2006 WL 1132083, at *1.  As noted previously, trial counsel was assisted at trial by Toni Blake "who had expertise in defending against allegations of child abuse." *Maze*, 2011 WL 3758608, at *4.  Trial counsel also vigorously cross-examined "the prosecution experts as to other possible causes of the victim's death." *Id.*

The prosecution called six medical witnesses to show that the victim's death resulted from child abuse.  *See generally Maze*, 2006 WL 1132083, at *1-10.  These doctors were questioned extensively about such issues as Mrs. Maze's pregnancy history, the victim's medical history after birth, the victim's liver issues, and what other ailments might have accounted for the victim's injuries.  Ultimately, Dr. Starling opined that the victim was a "battered child" and diagnosed the victim with AHT, a diagnosis inclusive of SBS. *Id.* at *4.  She observed that there was "clearly" impact to the victim's head.  She noted that various medical professionals had performed multiple tests on the victim to determine if there were any other possible causes for his injuries.  She specifically observed that the victim's blood clotted normally and that he tested negative for any bleeding disorders.  *Id.* at *3.  Moreover, in May 1999, the treating physicians from Vanderbilt specifically tested the victim for venous thrombosis and ruled it out.  *Maze*, 2010 WL 4324377, at *17.  In addition to these injuries, Dr. Starling indicated that the information provided by Mr. Maze did not adequately account for the origin of the victim's injuries.  *Maze*, 2006 WL 1132083, at *4.  Dr. Starling was cross-examined about her knowledge of SBS and the debate in the medical community regarding an SBS diagnosis.  She was also asked about Mrs. Maze's pregnancy complications and their potential impacts on the victim, as well as the absence of any neck injury to the victim, the victim's increase in head circumference, and the victim's tachycardia.  *See id.* at *4-5.

Dr. Jennings reviewed the victim's MRI scans and determined that the mechanism of injury was a "severe acceleration-deceleration injury" that resulted from a blow applied to the left forehead.  *Id.* at *6.  Dr. Jennings opined that the victim's "medical problems were the direct result of the May 3 head trauma[.]" *Id.*

- 55 -

Dr. Levy determined that the manner of death was homicide and that the cause of death was "anoxic encephalopathy due to a seizure disorder due to [SBS]." *Id.* at *9. Dr. Levy testified that, "on x-ray and visually during the autopsy[, he observed] a deformity of the left clavicle, which was consistent with the fracture that had been described in May of [1999]." He likewise emphasized that he had seen the victim's liver "with the naked eye as well as under the microscope." On cross-examination, the defense attacked the credibility of Dr. Levy's findings and autopsy report. *Id.* at *10. Importantly, Dr. Levy noted that he had reviewed the reports from the defense experts suggesting that the victim "had a liver disorder or a liver disease," but this did not change his opinion as to cause and manner of death because there "was no sign of liver failure on [the victim] at the time of his death." Dr. Jennings knew from autopsy slides the victim's liver showed signs of "dead liver tissue," and he agreed with Dr. Levy's conclusions regarding the victim's liver. *Id.* at *7.

Mr. Maze called three medical experts at trial to attempt to show the victim died of natural medical causes. *See generally id.* at *13-14. Dr. Schlechter, Mrs. Maze's attending obstetrics and gynecology physician, testified about Mrs. Maze's "high risk" pregnancy due to "chronic hypertension, gestational diabetes, inter-uterine growth restriction, and low amniotic fluid level." *Id.* at *13. *Id.* But Dr. Schlechter "considered the [victim] to be healthy . . . and detected no adverse effects from" the difficult pregnancy. *Id.* Dr. Willey, an expert in pathology, reviewed Dr. Levy's autopsy report and autopsy slides. *Id.* Dr. Willey said that "liver disease" caused by "aggressive hepatitis" was a "reasonable explanation" for the victim's death. *Id.* He also noted that the victim had "an abnormal diaphragm . . . that would make it difficult to breathe." *Id.* Dr. Willey opined that it was not "medically reasonable to attribute the death of the child in October 2000 to a trauma that occurred on May 3, 1999." *Id.* Finally, Dr. Washington, a professor of pathology at Vanderbilt, said that unlike Dr. Levy, she observed "significant abnormalities" in the victim's liver indicative of a "pattern of injury attributable to hepatitis," the degree of which "certainly could've been a significant contribution to death." *Id.* Yet, Dr. Willey conceded that the victim had suffered "definite and severe brain injuries[,]" and in Dr. Washington's opinion, those brain injuries were "the overriding cause of death." *Id.* at *13-14.

The defense aimed to identify medical mistakes in the prosecution's case and attempted to link the victim's injuries to pre-existing medical conditions, including the mother's pregnancy complications, the victim's premature birth, traumatic delivery, neonatal jaundice and liver damage, deterioration in the victim's diaphragm, and the adverse side effects from the Hepatitis B vaccine administered to the victim as a newborn. *See generally id.* at *1-14. Mr. Maze advanced many medically-based arguments to the jury challenging the State's proof at trial, specifically, that (1) the victim "had some pre-existing intercranial pressure"; (2) the victim "had significant and fatal liver disease";

(3) it was impossible to determine what caused the victim's brain injury; (4) "myopathy or deterioration" in the victim's diaphragm contributed to the breathing cessation in October 2000; (5) the Hepatitis B vaccination given to the victim could have caused his brain damage; and (6) Mrs. Maze's "pregnancy complications" caused the victim's health issues from birth. *Id.* at *15.

Then, in August 2007, Mr. Maze filed a pro se petition for post-conviction relief, arguing that he was denied effective assistance of counsel due to trial counsel's (1) failure to make an offer of proof regarding the testimony of pediatrician Dr. Yazbak; (2) failure to consult with a qualified medical expert regarding imaging evidence of the victim's neurological damage; (3) and failure to present a qualified medical expert to contradict the State's medical evidence regarding causation of the victim's brain and neurological damage. 2010 WL 4324377, at *1. He also filed a petition for a writ of error coram nobis in October 2007, "claiming that he had discovered medical evidence that his son died as a result of coagulopathy originating from birth-related trauma or other disorders, not child abuse." *Maze*, 564 F. App'x at 174. The original post-conviction court held a joint hearing on the two petitions, where Mr. Maze called two medical experts to support his claims—Dr. Barnes and Dr. Yazbak. Trial counsel also testified.

The post-conviction court entered separate orders denying Mr. Maze's petitions for post-conviction relief and for the writ of error coram nobis, which this court affirmed on appeal. *Maze*, 2010 WL 4324377, at *1. Specifically, this court held that Mr. Maze failed to show that trial counsel's assistance, relative to either presentation of Dr. Barnes or Dr. Yazbak, fell below acceptable standards or that he was prejudiced by any aspect of his trial counsel's performance. *Id.* at *23-28. With regard to Mr. Maze's petition for a writ of error coram nobis, this court determined that Dr. Barnes's testimony was cumulative of other evidence presented at trial and was not "newly discovered evidence" so as to qualify for the writ; rather, the testimony "serve[d] no other purpose than to contradict or impeach the evidence adduced during the course of the trial." *Id.* at *28-30.

Finally, in 2011, Mr. Maze sought habeas corpus relief in federal court. *Maze*, 2011 WL 3758608, at *1. Mr. Maze argued that trial counsel was ineffective for failing to submit an "Amicus Brief" that "was going to be favorable evidence for" him and for consulting with a radiologist, rather than a neurologist. *Id.* The Amicus Brief referenced by Mr. Maze included a chronology of events—presumably the same chronology referenced during these proceedings—that had been constructed by Mrs. Maze regarding the events of the victim's birth until his death. *See Maze*, 564 F. App'x at 177. In addition to opinions from Dr. Barnes and Dr. Yazbak, "[t]he Amicus Brief include[d] the opinions of nine additional physicians who, with varying degrees of certainty, suggest[ed] other possible causes of death not previously advanced in [Mr.] Maze's post-conviction arguments—such as

- 57 -

hepato-cellular necrosis or liver damage, anti-convulsant drugs, vaccinations, and severe anemia." *Id.* at 179.

Mr. Maze argued that, even if this claim was procedurally defaulted, he had "new reliable evidence" of his "actual innocence," which established an exception to equitably toll the statute of limitations. *Id.* at 180. The Sixth Circuit, like the district court, rejected this argument, determining that Mr. Maze failed to show that it was "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt[.]" *Id.* at 181 (quoting *Cleveland*, 693 F.3d at 633). Dispensing with Mr. Maze's ineffective assistance of counsel claim for failure to consult a neurologist, the Sixth Circuit determined that Mr. Maze had failed to show a substantial "likelihood of a different result." *Id.* at 183. Citing to this court's detailed explanation in the original post-conviction proceedings, the Sixth Circuit observed that, "although trial counsel did not consult with a neurologist such as Dr. Barnes, counsel presented a significant amount of medical testimony in an attempt to demonstrate that [Mr.] Maze did not abuse the victim and, alternatively, that the victim's brain injury did not cause his death." *Id.*

Now, at the 2024 hearing, Mr. and Mrs. Maze again introduced further expert medical opinions, that largely echoed the previously given opinions, to show the victim died from natural causes rather than abuse at the hands of Mr. Maze. Many of the experts also testified that they did not observe a clavicle fracture on the victim's scans and x-rays—again, a matter that has been of much debate. As the post-conviction court noted, this is nothing more than "new ammunition in a 'battle of the experts'" and "[o]bjectively, the facts remain the same," but "[s]ubjectively, opinions have been offered for more than two decades on the <u>same facts</u>."

Within the error coram nobis context, this court has consistently concluded that recently acquired expert opinions on previously presented evidence do not constitute newly discovered evidence. *See, e.g.*, *Lowery v. State*, No. E2017-02537-CCA-R3-PC, 2019 WL 2578623, at *21 (Tenn. Crim. App. June 24, 2019); *Garrett v. State*, No. M2017-01076-CCA-R3-ECN, 2018 WL 1976358, at *10 (Tenn. Crim. App. Apr. 26, 2018); *Hugueley v. State*, No. W2016-01428-CCA-R3-ECN, 2017 WL 2805204, at *14 (Tenn. Crim. App. June 28, 2017). In *Hugueley*, this court said, "The coram nobis statute is intended to provide relief from what may have been an injustice, not to reward a petitioner who has been successful in his search to find new experts who disagree with the previous experts involved in the matter." 2017 WL 2805204, at *14. Similarly, this court has observed these same tenets in dealing with a claim of newly discovered at the motion for new trial phase—the defendant offering another expert opinion about the biological evidence introduced at trial. *State v. Richards*, No. E2022-01468-CCA-R3-CD, 2024 WL 4142596, at *42-44 (Tenn. Crim. App. Sep. 11, 2024), *perm. app. denied* (Tenn. Apr. 17, 2025).

Just as the original post-conviction court determined in 2007 with regard to Mr. Maze's petition for a writ of error coram nobis, these new opinions were cumulative of other evidence presented at trial and were not "newly discovered evidence" so as to qualify for the writ; rather, the testimony "serve[d] no other purpose than to contradict or impeach the evidence adduced during the course of the trial." *Maze*, 2010 WL 4324377, at *28-30; *see also Hart*, 911 S.W.2d at 375. Testimony from these recently located experts did not constitute newly discovered scientific evidence simply because they disagreed with the expert witnesses who testified at trial. *Garrett*, 2018 WL 1976358, at *10; *Hugueley*, 2017 WL 2805204, at *14.

The Petitioners' claims are nothing more than repetition of the already discussed and noted ongoing debate within the medical community about SBS—a debate which is not new, *see Maze*, 564 F. App'x at 180 ("acknowledg[ing] the controversy surrounding a diagnosis of SBS and the ongoing debate in the scientific community regarding the accuracy of the SBS triad" (citations omitted)), about which Dr. Starling was specifically questioned at Mr. Maze's trial in 2004, and which was a subject in every legal proceeding related to this case since. We agree with the Attorney General and the post-conviction court that the evidence relied upon, both the facts and the ultimate opinions offered, were not truly "new" scientific evidence.

b.      Clear and Convincing Proof

As noted above, to meet the clear and convincing standard, the evidence offered must not be vague or uncertain. *See Clardy*, 691 S.W.3d at 408 (citing *Jones*, 450 S.W.3d at 893). Moreover, the new scientific evidence of actual innocence should leave the court with no serious or substantial doubt about the correctness of the conclusions drawn from the evidence, *i.e.*, that the petitioner did not commit the offense. *Id.*; *Keen*, 398 S.W.3d at 612. Here, due to the vague and speculative nature of the testimony from the Petitioners' experts, the Petitioners have failed to provide clear and convincing evidence that Mr. Maze is actually innocent based upon new scientific evidence, *i.e.*, that he did not commit the offense of aggravated child abuse which caused the victim's death.

While the Petitioners' experts agreed that abuse was not the likely culprit for the victim's injuries, they were not in accord as to the underlying cause or disorder that resulted in the victim's death. Dr. Mileusnic-Polchan believed that the victim suffered from "some sort of systemic disorder[,]" although none was specified. She disagreed with the prior assertions made at trial that "the only *reasonable cause* [of] the bleeding in [the victim's] brain was a sever[e] acceleration/deceleration injury[,]" and further disagreed that the victim suffered "a blow." Dr. Scheller testified that the victim presented with

- 59 -

"cardiorespiratory arrest . . . due to venous strokes[,]" and he "did not see evidence of an arterial stroke in [the victim's] case." Dr. Laposata was convinced "with absolute certainty that there was an underlying disease" in the victim's case, although once more, none was ever specified. Dr. Laposata also believed that a clot could have explained the victim's presentation, including the retinal hemorrhaging. He explained a condition known as "interval thrombosis" that caused a "stroke-like effect." Dr. Hunsaker believed it was "*reasonable* to conclude that various metabolic and conditions related to clotting of blood" explained the changes in the victim's brain that led to the victim's death. Dr. Sandler-Wilson believed that the victim had "some sort of viral syndrome going on" and that a metabolic disorder was a potential explanation for the victim's condition. Dr. Mack opined that "a stroke or other natural disease [would] be a *plausible explanation* of the bleeding that occurred over time in [the victim's] case[.]" Finally, Dr. Hutchins opined that the injury mechanism in this case was due to an "ischemic arterial stroke[,]" as arrayed in a typical arterial distribution rather than a venous stroke; and while he disagreed with the other experts who had diagnosed a venous stroke, he said that such, nonetheless, was "*a reasonable consideration*." Dr. Hutchins also said that he believed the victim's brain bleeding was resultant from "[a] birth related subdural hematoma[.]"

Again, much of the expert testimony at the evidentiary hearing centered on the fact that more investigation in the past was needed in the victim's case to rule out the possibility of other mimickers. But as is evident, these opinions offer no definitive answer for the victim's cause of death. Rather, these opinions simply speculate and add to the list of a bevy of possibilities for the victim's death that have been proposed over the course of this case.

Despite the purported advancements in science and medicine, the victim's injuries were still consistent with the possibility of AHT. As noted by the post-conviction court, several of the Petitioners' experts were unwilling to definitively exclude the possibility of abuse. Dr. Scheller explained that an impact injury was not out of the realm of possibility, but it was "unlikely." Dr. Laposata testified that it was "incorrect" to assert that AHT was the *only* explanation for the victim's condition, implying that it could be one. Dr. Mack stated obliquely "that a conclusion of severe trauma would be *unsafe* based on the imaging findings" and indicated that there were other "*plausible* explanation[s]."

According to the State's proof at Mr. Maze's trial, following the victim's May 3, 1999 admission to Vanderbilt, the victim's treating physicians assessed him for venous thrombosis and were able to rule it out. Testing for bleeding disorders was likewise negative; in fact, the victim's blood was observed to clot normally. Also, the victim never displayed liver disease prior to his October 19, 2000 hospitalization. The State also presented evidence at trial that, in addition to the victim's triad of symptoms for brain

injury, the victim suffered a fractured clavicle, and there was visible bruising about his body. Those x-rays were shown to the jury, and in trial counsel's opinion, the clavicle fracture "was fairly readily identifiable." Moreover, Dr. Levy testified at trial that, "on x-ray and *visually during the autopsy*[, he observed] a deformity of the left clavicle," and specifically differentiated the error in his autopsy report noting a right clavicle fracture. Dr. Starling described the victim's abdominal bruising to the jury: "He had a large, purplish bruise on his abdomen, all the way from his ribs to his groin and from his belly button around his side, a very large bruise on his belly." Dr. Starling, in addition to AHT, diagnosed the victim as a "battered child." *Maze*, 2006 WL 1132083, at *4.

And, as this court noted on direct appeal, there was non-medical evidence indicative of Mr. Maze's guilt. *Id.* at *16. Particularly note-worthy were various statements made by the Petitioners: (1) Mrs. Maze told Dr. Starling that she noticed the bruises on the victim's face three or four days earlier, although she could not account for the source; (2) in Mrs. Maze's statement to Det. Carter, she informed him that "the bruises first appeared the weekend that she began her part-time employment"; (3) in Mr. Maze's statement to Det. Carter, he "repeatedly denied shaking the [victim], but he eventually conceded that he 'might' have shaken the [victim] and second that he shook the [victim] because he 'freaked out'"; (4) Mrs. Maze admitted at trial that there was a "possibility" that the victim was "normal until brought to the hospital and that she told Detective Carter that [he] did not become fussy until she began her part-time job" and left him in Mr. Maze's care; (5) at trial, Mrs. Maze acknowledged that Mr. Maze told her "it was possible that he 'might' have shaken the [victim] and that in picking up the [victim], it was possible that he could have fractured the clavicle"; (6) Mr. Maze admitted "at trial that he had shaken [the victim], although he insisted that the shaking was not violent, and he conceded that he could have fractured the [victim's] clavicle"; and (7) when Mr. Maze made his admission to Det. Carter after being asked repeatedly about the shaking, he "prefaced it by saying that he would only talk outside [Mrs. Maze's] presence because he did not want [her] to know what happened." *Id.* at *4, *9, *11, *13, *16.

We agree with the post-conviction court that the Petitioners have failed to meet their burden of providing clear and convincing proof. For all these reasons, the Petitioners are not entitled to relief on their claims based on their assertion of Mr. Maze's actual innocence.

### 3. Independent Review of Mrs. Maze's Claim

Mrs. Maze argues that, based on the evidence presented below, she "had abundant reason to doubt that [the victim] suffered any inflicted trauma[,]" and the post-conviction court erred by denying her petition "without independent review" of her actual innocence

claim. Mrs. Maze asserts that her claim of actual innocence does not entirely "rise[] and fall[] on the merits" of Mr. Maze's claim as the post-conviction court found. Rather, she contends that she is entitled to individual consideration "[g]iven the materially different elements of their" conviction offenses—reckless assault due to Mrs. Maze's failure to protect the victim versus Mr. Maze's commission of felony murder and aggravated child abuse. According to Mrs. Maze, "[i]f the nation's leading scientific experts—with the benefit of their superior professional knowledge, medical experience, and modern scientific consensus—would not have perceived that" the victim suffered inflicted trauma, then certainly "no reasonable jury" would have found her guilty of recklessly failing to protect the victim from said trauma. She asserts, "As a result, the evidence introduced at the post-conviction hearing proved that Mrs. Maze's belief that [the victim] was not a victim of inflicted abuse was reasonable, and that evidence precludes her conviction." Despite Mrs. Maze's protestations, we agree with the Attorney General that the post-conviction court did not err by denying Mrs. Maze's "petition with the same reasoning as it denied" post-conviction relief to Mr. Maze.

First, we briefly observe that Mrs. Maze was originally charged with aggravated assault and later entered a best-interest plea to the lesser included offense of reckless aggravated assault. Thus, any differential argument about her "reckless" disregard of the bruising about the victim is of no consequence, as she was charged with an intentional act. Moreover, Mrs. Maze found it in her best interest to plead guilty based upon the information available to her in May 2000 following the first jury determination of Mr. Maze's guilt in January 2000. Her *Alford* plea "had the same effect as a plea of guilty insofar as the prosecution and [her] disposition were concerned." *State v. Albright*, 564 S.W.3d 809, 818 (Tenn. 2018) (citing *Alford*, 400 U.S. at 35 n.8). And, while Mrs. Maze entered a best-interest plea, forgoing any admission of guilt, she specifically testified at Mr. Maze's trial that she was aware of bruises on the victim that "first appeared the weekend that she began her part-time employment." *Maze*, 2006 WL 1132083, at *13. To whatever veiled extent Mrs. Maze is asking this court to revisit the sufficiency of the factual basis supporting her plea by imputing expert testimony and medical acumen for her benefit in hindsight, she is not to be so indulged. *See State v. Starnes*, No. M2002-01450-CCA-R3-CD, 2003 WL 1094071, at *2 (Tenn. Crim. App. Mar. 13, 2003) (concluding that whether there was sufficient factual evidence supporting the defendant's guilty plea was waived as a matter of law by the plea itself).

Importantly, Mrs. Maze also never made any independent argument or sought review of any separate claim regarding her actual innocence in the post-conviction court. Appellate review is generally limited to issues that have been properly preserved and presented for appeal. *State v. Bristol*, 654 S.W.3d 917, 923-25 (Tenn. 2022). "It has long been settled in Tennessee that a party cannot take advantage of errors which he himself

committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *State v. Garland*, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981) (collecting cases); *see* Tenn. R. Crim. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). In her petition, Mrs. Maze argued that her "conviction depend[ed] on" Mr. Maze's "having physically assaulted" the victim and that the victim's injuries were "not consistent with inflicted trauma or the [SBS] diagnosis that underlies" their convictions. Then, at the conclusion of the evidentiary hearing, Mrs. Maze's counsel summarized her argument, "And what you have here is overwhelming evidence that [Mr.] Maze did not abuse this child." Because Mrs. Maze's actual innocence claim in the post-conviction court rested solely on "new scientific evidence of actual innocence" for Mr. Maze, and her by corollary, any new spin to this argument on appeal is waived.

### D.    Dr. Levy's Affidavit

As a final issue, the Petitioners move this court to stay their appeals and remand this case to the post-conviction court for further proceedings concerning the newly submitted affidavit of the performing medical examiner, Dr. Levy. In the affidavit, Dr. Levy recants much of his trial testimony regarding the manner and cause of the victim's death. This court has previously denied this motion, although it was noted in the order so doing that the assigned panel could revisit the issue, and the Petitioners renewed their motion at oral argument. The Attorney General responds that remanding this case to the post-conviction court does nothing more than allow the Petitioners another proverbial bite at the apple of establishing their claims of actual innocence.

Mrs. Maze cites to *Pruett v. State* as support for her proposition that an "appellate court may properly remand for the taking of evidence of new facts never before presented in the case." 501 S.W.2d 807, 809 (Tenn. 1973). In *Pruett*, the petitioner, convicted of burglary, filed a post-conviction petition in April 1972. *Id.* at 808. That petition was amended in June 1972, to include an allegation predicated on the holding of *Waller v. Florida*, 397 U.S. 387 (1970), that a state prosecution based upon the same act for which the defendant was previously prosecuted in municipal court constituted a double jeopardy violation. *Pruett*, 501 S.W.2d at 808 (citing *Waller*, 397 U.S. at 395). The petitioner noted that the burglary charge that resulted in his conviction in the Criminal Court for Hamilton County had previously been heard in full on the merits and dismissed in the City Court of Chattanooga. *Id.*

The petition was denied following a hearing in October 1972, and the petitioner appealed to this court. *Id.* Shortly after the filing of his appeal, in January 1973, the rule

in *Waller* was given retroactive effect. *Id.* (citing *Robinson v. Neil*, 409 U.S. 505, 511 (1973)). On appeal, we "remanded the case to determine whether the [petitioner] was placed in jeopardy on the burglary charge in the city court." *Id.* The State then appealed to our supreme court, which ultimately affirmed our decision by relying on current Tennessee Code Annotated section 27-3-128. *See id.* at 808-10.

In affirming, our supreme court noted that, because the petitioner's double jeopardy defense had not been recognized as having a legal basis previously, facts tending to support that defense had not been developed at the evidentiary hearing. *Id.* at 809. Thus, through no fault of his own, the petitioner came on appeal with an apparently valid constitutional claim that was nevertheless lacking in factual support. *Id.* The court also observed that "post-conviction relief may not be predicated on grounds that have been previously determined, or that have been waived by failure to assert them." However, these tenets did "not apply to a defense [or ground for relief] . . . which did not exist and could not have been asserted by the most diligent counsel at the time of the [post-conviction] hearing." *Id.* The court noted that its decision was consistent with the interests of judicial efficiency, given that the petitioner could have filed a completely new post-conviction claim based on the recently announced double jeopardy principle. *Id.*

Code section 27-3-128, relied upon by our supreme court in *Pruett*, speaks of "correction to the record":

> The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as may be deemed right.

However, unlike *Pruett*, this is not a case of some defect in the record, incomplete findings, or *oversight without culpable negligence*. Indeed, the failure to offer Dr. Levy's affidavit or testimony at the post-conviction hearing is not "a defense [or ground for relief] . . . which did not exist and could not have been asserted by the most diligent counsel at the time of the [post-conviction] hearing." *See Pruett*, 501 S.W.2d at 809.

Dr. Levy was clearly accessible prior to the evidentiary hearing. Importantly, the Petitioners have given no reason as to why Dr. Levy's opinion was not sought prior to these proceedings or why he was not included in these proceedings at the appropriate time. Code section 27-3-128 "does not authorize courts to indulge piecemeal and protracted litigation concerning facts that should have obviously been established at the original" proceeding. *Killian v. Campbell*, 760 S.W.2d 218, 222 (Tenn. Ct. App. 1988). Our statutes do not adopt

"an open- and possibly never-ending approach to post-conviction review." *State v. West*, 19 S.W.3d 753, 756 (Tenn. 2000); *see* Tenn. Code Ann. § 40-30-109(a) (requiring a post-conviction hearing to occur within five months of the State's response, allowing a continuance of the hearing only "based upon a finding that unforeseeable circumstances render a continuance a manifest necessity[,]" and even then, limiting the extension to no more than sixty days).

We recognize that the post-conviction court here emphasized the unlikely prospect of Dr. Levy's changing his medical opinion in this case, and there is certainly significance to the performing medical examiner's recantation of his trial testimony regarding the manner and cause of the victim's death. However, Dr. Levy's changed opinion as expressed in his affidavit is merely a matter of witness recantation, rather than providing new scientific evidence of actual innocence. Ostensibly, the only new records to be submitted to Dr. Levy prior to his current review were Mrs. Maze's obstetric records and the victim's records from birth until May 3, a period of approximately five weeks, all of which were available at the time of autopsy and Mr. Maze's trial in 2004. And he merely indicated that he had taken into account the opinions of the other experts who had recently reviewed the case, "as well as changes in medical opinions regarding [SBS] and improved knowledge regarding natural conditions present in [the victim] that increased the risks for sudden catastrophic neurologic events that are non-traumatic in origin." Similar to many of the other experts, this was nothing more than a bare allegation of a possibility, lacking in any specifics, that there existed some other natural cause that might have led to the victim's death.

For these reasons, we decline to deviate from our previous determination denying the Petitioners' motion to stay and remand this case to the post-conviction court for consideration of Dr. Levy's recantation. "Due process in the post-conviction context merely requires that 'the [petitioner] have the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Dotson v. State*, 673 S.W.3d 204, 222-23 (Tenn. 2023) (quoting *Stokes v. State*, 146 S.W.3d 56, 61 (Tenn. 2004)). "A full and fair hearing requires only 'the *opportunity* to present proof and argument on the petition for post-conviction relief.'" *Id.* at 223 (emphasis added) (quoting *House v. State*, 911 S.W.2d 705, 714 (Tenn. Crim. App. 1995)); *see also* Tenn. Code Ann. § 40-30-106(h) ("A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence."). The Petitioners have had a full and fair hearing based upon their post-conviction pleadings as filed. They are not entitled to a second chance to prove their claims under these circumstances.

### III.   CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgments of the post-conviction court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE